IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION

RABO AGRIFINANCE, INC.                                                 PLAINTIFF

vs.                        Case No. 2:14cv111-JM

TURNER GRAIN MERCHANDISING, INC.;
JASON T. COLEMAN; and
DALE C. BARTLETT.                                                     DEFENDANTS

This case assigned to District Judge _____
**COMPLAINT** and to Magistrate Judge _____

Plaintiff Rabo Agrifinance, Inc. ("Rabo"), for their verified complaint against Defendants Turner Grain Merchandising Inc., (Turner Grain"), Jason T. Coleman ("Coleman"), and Dale C. Bartlett ("Bartlett") (collectively, the "Defendants"), state:

1. This is an action on debts that the Defendants owe to Plaintiff under certain agreements and line of credit notes. Plaintiff sues in order to collect the debts owed and to prevent fraudulent transfers of the Defendants' assets in a manner that may hinder or prevent collection of the debts.

**Parties**

2. Plaintiff Rabo is a Delaware corporation with its principal place of business in St. Louis, Missouri.

3. Defendant Turner Grain is an Arkansas corporation with its principal place of business in Monroe County, Arkansas.  The Secretary of State lists their registered agent as resigned.

4. Defendant Coleman is an Arkansas citizen and resident of Lee County, Arkansas.

5. Defendant Bartlett is an Arkansas citizen and resident of Lee County, Arkansas.

**Jurisdiction and Venue**

7.   This action arises under the laws of the United States.  This Court has original

jurisdiction under 28 U.S.C. § 1332.

8.   The parties are citizens of different states and the amount in controversy exceeds the

sum or value of $75,000.00, exclusive of interests and costs.

9.   This Court has personal jurisdiction over the Defendants.

10.   Venue is proper in this Court under 28 U.S.C. § 1391(a)(2), (b)(2).

**Rabo's Agreements and Accounts with Turner Grain, Coleman, and Bartlett**

11.   Rabo provides financing for farmers, ranchers, and agribusinesses throughout the

United States.

12.   On January 2, 2014, Turner Grain, Coleman, and Bartlett, collectively entered into a

Credit Agreement with Rabo. A copy of the signed Credit Agreement is attached as Exhibit A.

Under that Agreement, Rabo agreed to extend credit to Turner Grain, Coleman, and Bartlett with

a balance not to excess the less or $1,000,000.00 or the borrowing base as defined by the Credit

Agreement.

13.   On January 2, 2014, Turner Grain, Coleman, and Bartlett, collectively entered into a

Line of Credit Note with Rabo. A copy of the signed Line of Credit Note is attached as Exhibit

B.

14.   On January 2, 2014, Turner Grain entered into a Security Agreement with Rabo

whereby Turner Grain granted Rabo a security interest in all accounts, inventory, equipment,

fixtures, farm products, general intangibles, proceeds of crop insurance, price support payment,

or other governmental program, rights and interests under Hedging Agreements, accessions,

attaches and other additions to the collaterals; substitutes or replacement for collateral, all

proceeds, products, rents, and profits of any collateral including rights under warranties and

insurance contracts, and causes of action relating to collateral, and all books and records pertaining to any collateral. A copy of the signed Security Agreement is attached as Exhibit C.

15.   On January 6, 2014, Rabo perfected its security interest by filing a UCC Financing Statement with the Arkansas Secretary of State. A copy of the UCC Financing Statement is attached as Exhibit D.

16.   Beginning on January 6, 2014, Turner Grain, Coleman, and Bartlett began making payments and draws on its line of credit with Rabo. A true and correct copy of these transactions is attached as Exhibit E.

## COUNT I:  SUIT ON THE DEBT

17.   Rabo incorporates and realleges herein each and every allegation set forth in paragraphs 1 through 16.

18.   Turner Grain currently owes $985,140.00 on its account with Rabo. (*See* Exhibits A-E.)

19.   Coleman, individually, is jointly and severally liable for the debts incurred on Turner Grain's account with Rabo by virtue of his individual signature on the Credit Agreement and Line of Credit Note.  (Exhibits B-E).

20.   Bartlett, individually, is jointly and severally liable for the debts incurred on Turner Grain's account with Rabo by virtue of his individual signature on the Credit Agreement and Line of Credit Note.  (Exhibits B-E).

21.   Rabo is therefore entitled to receive payment from the Defendants on the debt owed under the Turner Grain account with Rabo. (*See* affidavit of account, attached as Exhibit F).

## COUNT II:  BREACH OF CONTRACT

22.      Rabo incorporates and realleges herein each and every allegation set forth in paragraphs 1 through 21.

23.     Turner Grain has breached its Credit Agreement and Line of Credit Note with Rabo by not paying on its account. Turner Grain currently owes $985,140.00 on its account with Rabo. (*See* Exhibits A-E.)

24.     Coleman has breached Turner Grain's Credit Agreement and Line of Credit Note with Rabo by not paying on the account. Coleman is individually, and jointly and severally, liable on the amount owed by Turner Grain to Rabo. (*See* Exhibits B-E.)

25.     Bartlett has breached Turner Grain's Credit Agreement and Line of Credit Note with Rabo by not paying on the account. Coleman is individually, and jointly and severally, liable on the amount owed by Turner Grain to Rabo. (*See* Exhibits B-E.)

26.     As a direct and proximate cause of Defendants' default and breaches, including but not limited to, their failure to pay certain amounts due and owning under the Line of Credit Note, Rabo has suffered direct damages in the amount of $985,140.00.

27.     The Defendants are liable for Rabo's attorneys' fees and costs in bringing this action.  ARK. CODE ANN. § 16-22-308.

## COUNT III: Foreclosure, Possession and Judgment

28.     Rabo incorporates and realleges herein each and every allegation set forth in paragraphs 1 through 27.

29.     Rabo is entitled to the foreclosure of its liens and security interests in the grain currently held by Turner Grain, as well as all other accounts, inventory, equipment, fixtures, farm products, general intangibles, proceeds of crop insurance, price support payment, or other governmental program, rights and interests under Hedging Agreements, accessions, attachments and other additions to the collaterals; substitutes or replacement for collateral, all proceeds, products, rents, and profits of any collateral including rights under warranties and insurance

contracts, and causes of action relating to collateral, all books and records pertaining to any collateral, and other collateral as provided by Rabo perfected security interest.

30.     Rabo is entitled to the immediate possession of the grain currently held by Turner Grain, as well as all other account, inventory, equipment, fixtures, farm products, general intangibles, proceeds of crop insurance, price support payment, or other governmental program, rights and interests under Hedging Agreements, accessions, attaches and other additions to the collaterals; substitutes or replacement for collateral, all proceeds, products, rents, and profits of any collateral including rights under warranties and insurance contracts, and causes of action relating to collateral, and all books and records pertaining to any collateral, as provided by Rabo perfected security interest. Rabo is entitled to the issuance of a writ of possession for the above listed collateral.

31.     Rabo is entitled to judgment against the Defendants for all sums due and owing under the Turner Grain account. (*See* Exhibit F).

WHEREFORE, the Plaintiff Rabo AgriFinance, Inc. respectfully requests that the Court:

(a)  grant the Plaintiff a money judgment against all Defendants, jointly and severally, for the amount owed on Turner Grain's account with the Plaintiff;

(b)  grant the Plaintiff a money judgment for compensatory damages against all Defendants as to all causes of action alleged in the Complaint;

(c)  declare Plaintiff entitled to the immediate possession of the collateral secured by Plaintiff's perfected security interest as outline herein;

(d)  award the Plaintiff their costs and attorneys' fees in bringing this action; and

(e)  grant all other relief to which the Plaintiff is entitled.

WILLIAMS & ANDERSON PLC
111 Center Street, Suite 2200

Little Rock, Arkansas 72201
Telephone: (501) 372-0800
Facsimile:  (501) 372-6453

By: _____
James E. Smith, Ark. Bar No. 77128
jsmith@williamsanderson.com

*Counsel for Plaintiff Rabo Agrifinance, Inc.*

Turner Grain Merchandising

No: 10908500/JO

### CREDIT AGREEMENT

This agreement is dated as of January 2, 2014. It is between TURNER GRAIN MERCHANDISING, INC., an Arkansas corporation ("Turner Grain Merchandising, Inc."); JASON T. COLEMAN ("Jason Coleman"); and DALE C. BARTLETT ("Dale C. Bartlett") (Turner Grain Merchandising, Inc.; Jason Coleman; and Dale C. Bartlett are individually and collectively, "Borrower") and RABO AGRIFINANCE, INC., a Delaware corporation ("Lender").

Borrower requests that Lender provide a line of credit to Borrower. Lender will provide a line of credit, subject to the terms of this agreement.

### ARTICLE 1 - THE LINE OF CREDIT

**1.01    The Line of Credit.** Lender shall extend credit (the "Line of Credit") from time to time during the period from the Closing Date to the Maturity Date (that period, including extensions, if any, the "Availability Period") by making loans to Borrower (each such loan a "Loan") on a revolving basis.

**1.02    Maximum Amount.** The aggregate unpaid principal balance of the Loans must not exceed the lesser of: (i) $1,000,000.00 or (ii) the Borrowing Base.

**1.03    Borrowing Base.**

(a)    "Borrowing Base" means the sum of:

    (i)    65% of the Value of Eligible Inventory; plus

    (ii)    80% of Eligible Accounts Receivable; minus

    (iii)    100% Related Payables and Liabilities.

(b)    For purposes of calculation of the Borrowing Base:

    (i)    "Accounts Receivable" means accounts which: (A) arise from the sale of goods or the providing of services by Borrower, which comply with the account debtor's specifications (if any) and have been provided or delivered to, and have been accepted by, account debtor, (B) arise in the ordinary course of Borrower's business, (C) are evidenced by an invoice rendered to account debtor dated not earlier than the date of the provision of services or the date of shipment or delivery of goods, as applicable, (D) have payment terms acceptable to Lender, (E) are not evidenced by a note, chattel paper or other instrument, (F) are not payable on an installment basis, (G) are valid, legally enforceable and unconditional obligations of account debtor, and not subject to any setoff, counterclaim, or credit, allowance or adjustment by account debtor, or to any claim by account debtor denying liability thereunder in whole or in part (to the extent of the amount of such setoff or counterclaim) or are restructured, extended or modified, (H) do not arise out of a contract which, by its terms, forbids, restricts or makes void or unenforceable the assignment by Borrower to Lender of the account arising with respect thereto, (I) are owing by an account debtor which (1) is not an Affiliate of Borrower, (2) is a resident or citizen of, and is located within, the United States of America, and (3) is not the subject of an Insolvency Proceeding, (J) are not accounts arising from a "sale on approval", "sale or return" or "consignment", or subject to any other repurchase or return agreement, (K) are not accounts with respect to which possession and/or control of the goods sold giving rise thereto is held, maintained or retained by Borrower (or by any agent or custodian of Borrower), (L) comply with all warranties, representations and covenants in the Loan Documents relating thereto, (M) if account debtor is the United States of America or any state or local governmental entity, or any department, agency or instrumentality thereof, Borrower has assigned its rights to payment of such Accounts to Lender, pursuant to the Assignment of Claims Act of 1940, as amended, or pursuant to any similar state or local law, regulation or requirement, or as otherwise acceptable to Lender and (N) are not owing by an account debtor with respect to which 20% or more of the aggregate accounts owing by such account debtor to Borrower are ineligible Accounts Receivable for any reason; provided, that Lender may, consistent with Lender's normal credit practices, from time to time upon 30 days prior written notice to Borrower, designate categories of ineligible accounts in addition to those above; provided, also, that such designation shall be immediately effective upon the occurrence of an Event of Default or if an Event of Default is in existence at the time of such designation;

    (ii)    "Eligible Accounts Receivable" means (as may be further limited by specific defined terms) Accounts Receivable which are (A) owned by Borrower, (B) subject to a first priority perfected security interest in favor of Lender, (C) not subject to any Lien in favor of a Person other than Lender, (D) neither 30 days past the original due date nor 30 days past the later of (1) the date of invoice, if any, or (2) the date of delivery, and (E) otherwise acceptable to Lender; excluding any portion constituting advertising, finance charges, services charges, or sales or excise taxes;

    (iii)    "Eligible Inventory" means Inventory which is (A) owned by and in the possession of Borrower at a location owned by Borrower or otherwise acceptable to Lender, (B) subject to a first priority perfected security interest in favor of Lender; (C) not subject to any Lien in favor of a Person other than Lender; and (D) otherwise acceptable to Lender;

    (iv)    "Inventory" means Inventory which: (A) is not (1) packaging or shipping materials, (2) goods used in connection with maintenance or repair of properties or assets owned by Borrower, Guarantor, or any Affiliate or Subsidiary of Borrower, (3) general supplies or (4) work-in-process; (B) complies with all standards, if any, imposed by Governmental Authorities; (C) complies with all warranties, representations and covenants in the Loan Documents relating thereto; (D) is not unacceptable to Lender due to age, type, category, quality and/or quantity; and (F) is not subject to any licensing, patent, royalty, trademark, trade name or copyright agreement of any other Person that would materially restrict Lender's ability to sell or otherwise dispose of such Inventory ; provided, that Lender may, consistent with Lender's normal credit practices, from time to time upon 30 days prior written notice to Borrower, designate categories of ineligible Inventory in addition to those above; provided, also, that such designation shall be immediately effective upon the occurrence of an Event of Default or if an Event of Default is in existence at the time of such designation;

    (v)    "Related Payables and Liabilities" means all accounts payable including trade account payables or other unpaid costs of acquiring the Collateral included in the Borrowing Base, and the amount of all Liens on and any offsets and contra accounts relating or pertaining to that Collateral; and

    (vi)    "Value" means (A) with respect to Eligible Inventory, the value as determined by Lender.


EXHIBIT
A

(c)     The Borrowing Base for purposes of each Loan will be determined by the most recent Borrowing Base Certificate received by Lender, subject however, to adjustments by Lender consistent with this agreement.

**1.04     Loans under the Line of Credit.** Loans under the Line of Credit are subject to Article 4. Loans must be used only for grain purchases and operating needs.

**1.05     Revolving Nature.** The Line of Credit is a revolving line of credit; and during the Availability Period, subject to the terms and conditions of this agreement, Borrower may repay principal amounts and reborrow them.

**1.06     Interest.** The unpaid principal balance of Loans under the Line of Credit will bear interest at a rate equal to the one month LIBOR plus 3.500% per annum, Adjusted on the first day of each month (the "LIBOR Indexed Rate").

**1.07     Required Payments; Maturity Date.**

(a)     Borrower shall pay accrued interest on the Line of Credit on January 1, 2015 and on the first day of each January after the Closing Date to the Maturity Date.

(b)     The unpaid principal balance of, all unpaid accrued interest on, and other charges under this agreement with respect to the Line of Credit, shall be paid on January 1, 2015 (the "Maturity Date").

**1.08     Prepayments.** Subject to Section 2.07, Prepayments of the Line of Credit may be made at any time without prepayment fee or penalty.

**1.09     The Note.** Loans under the Line of Credit will be evidenced by this agreement and a promissory note in a form provided by Lender (the "Note").

## ARTICLE 2 - COVENANTS REGARDING THE LOANS

**2.01     Loan Requests.** Each Loan will be made upon the request of Borrower (a "Loan Request"). Each Loan Request (a) must comply with the requirements of Article 6; (b) at Lender's option, must be received by Lender before 12:00 noon (St. Louis, Missouri time) on a Business Day which is not less than one Business day prior to the date of the Loan; and (c) must specify the amount of the Loan. No Loan will be made if the interest rate for that Loan would exceed the Maximum Rate. Each Loan Request will be irrevocable. Lender may postpone making any Loan to the extent Lender is delayed by fire, earthquake or another circumstance outside Lender's reasonable control.

**2.02     Computation of Interest.** All computations of accrued interest under the Loan Documents other than interest at the Maximum Rate, and all fees under the Loan Documents, will be made on the basis of a year of 360 days for the actual number of days (including the first day but excluding the last day) elapsed; and all computations of interest accrued at the Maximum Rate will be based upon a year of the actual number of days in the respective year. Subject to Section 2.04, there is no limit on the amount that a rate of interest subject to Adjustment by Lender may increase at any one time, or in the aggregate. Lender's determination of a rate of interest will be conclusive, absent manifest error.

**2.03     Default Rate.** Upon the occurrence of an Event of Default, the principal balance of the Loans and, to the extent permitted by Applicable Law, all other Loan Obligations shall, from the date of the Event of Default until the date Lender notifies Borrower that it is waived or cured or all Loan Obligations are paid in full, bear interest at the Default Rate. Subject to the provisions of Section 2.04, the "Default Rate" means the rate applicable to the unpaid principal balance of the Line of Credit plus 10.000% per annum. Interest payable at the Default Rate shall be paid from time to time on demand, or if not sooner demanded, on the first day of each month. The provisions of this section may result in compounding of interest. The provisions of this section will neither constitute a waiver of any Event of Default nor require the declaration of an Event of Default.

**2.04     Maximum Rate.** Notwithstanding any provision of this agreement to the contrary, (a) no interest will be due on any amount due under this agreement if, under Applicable Law, Lender is not permitted to charge interest on that amount, and (b) in all other cases interest due under this agreement will be calculated at a rate not to exceed the Maximum Rate. If Borrower is requested by Lender to pay interest on any amount due under this agreement at a rate greater than the Maximum Rate, the amount of interest due on that amount will be deemed the Maximum Rate and all payments in excess of the Maximum Rate will be deemed to have been Prepayments without prepayment fee or penalty, and not interest. All amounts other than interest which are paid or agreed to be paid to Lender for the use, forbearance, or detention of Borrower's indebtedness to Lender under this agreement shall, to the extent permitted by Applicable Law, be amortized over the full stated term of the indebtedness, so that the rate of interest on account of that indebtedness does not exceed the Maximum Rate for so long as the indebtedness is outstanding.

**2.05     Method and Application of Payments.** All payments of principal, interest, and other amounts to be made under the Loan Documents shall be made to Lender in U.S. dollars and in immediately available funds, without set-off, deduction, or counterclaim, not later than 2:00 pm (St. Louis, Missouri time) on the dates on which those payments will become due (any of those payments made after the time on the due date will be deemed to have been made on the next succeeding Business Day). All payments received by Lender (including, to the extent permitted by Applicable Law, all proceeds received from the sale or other liquidation of the Collateral) will be applied to the Obligations in any order determined by Lender. The early or late date of making a regularly scheduled payment will be disregarded for purposes of allocating the payment between principal and interest. For this purpose, the payment will be treated as though made on the due date. In any legal action or proceeding, the entries made by Lender in an account or accounts maintained by Lender or Rabobank International or any of their Affiliates in accordance with its usual practice and evidencing the Obligations, will be *prima facie* evidence of the existence and amounts of those Obligations.

**2.06     Designated Account.** So long as Lender has any obligation to make Loans, upon the request of Lender, Borrower shall maintain a demand deposit account with Rabobank, N.A., or another bank approved by Lender (the "Designated Account") in good standing. If all of the applicable conditions to the Loan have been fulfilled, Lender shall make the Loan available to Borrower as set forth in the Request for Loan by, at the option of Lender, (a) depositing the proceeds in the Designated Account; (b) if applicable, transferring the proceeds to an agent designated for purposes of an escrowed Closing of this transaction by wire or ACH transfer; or (c) paying or applying the proceeds as otherwise permitted under this agreement, by any means appropriate under the circumstances.

**2.07     Prepayments Generally.** Lender may refuse to accept any Prepayment not expressly permitted in this agreement. If a Prepayment is conditioned upon prior notice to Lender, at the option of Lender, (a) that notice will be irrevocable; (b) a Prepayment will be due in the amount and on the date specified in that notice; and (c) that notice will not affect Borrower's obligation to make all other payments required under the Loan Documents on the date when due. Borrower shall have the option of making any Prepayment subject to payment of all amounts then due Lender under this agreement. Each Prepayment of a portion of Loan will be applied to the most remote payment of the principal due under this agreement. If Lender receives any Prepayment which it is permitted to refuse, Lender may accept the Prepayment; except that Lender may, as a condition of

Turner Grain Merchandising
Credit Agreement

acceptance, require the payment of interest which would accrue on the amount prepaid through the date when Lender would be obligated to accept the Prepayment, or the date the principal amount prepaid would be due under this agreement, whichever is earlier.

**2.08** **Mandatory Repayments.** If at any time the unpaid principal balance of a Loan exceeds the maximum amount thereof under the terms of this agreement, then, upon demand by Lender, Borrower shall repay that portion of the principal balance thereof in excess of that maximum amount, along with all unpaid accrued interest on that portion.

**2.09** **Inability to Determine Rates.** If, in connection with any Loan bearing interest at a rate to be determined in whole or in part on the basis of the applicable LIBOR (a "LIBOR Based Rate"), Lender determines that (a) United States dollar deposits are not being offered to banks in the London interbank market for the applicable amount of such Loan, (b) adequate and reasonable means do not exist for determining the applicable LIBOR Based Rate, or (c) the applicable LIBOR Based Rate does not adequately and fairly reflect the cost to Lender of funding that Loan, Lender will promptly so notify the Borrower.  Thereafter, the obligation of Lender to make or maintain any Loan bearing interest at the applicable LIBOR Based Rate shall be suspended until Lender revokes such notice, and all Loans which would otherwise bear interest at the applicable LIBOR Based Rate shall accrue interest at that rate, per annum, equal to a rate determined by Lender in Lender's reasonable discretion.

### ARTICLE 3- COLLATERAL

The payment and performance of the Obligations are secured by the following:

(a)  all Liens in favor of Lender created under (i) the Security Agreement dated as of the date of this agreement between Lender, as agent for itself and the other Secured Parties (defined therein) under the Collateral Agency Agreement, and Turner Grain Merchandising, Inc.; and (ii) any other instrument or agreement delivered to Lender in conjunction with this agreement, which states that it secures all or any of the Obligations (the property encumbered by those Liens, the "Collateral;" and those instruments and agreements securing all or any of the Obligations, the "Collateral Documents");

(b)  all Liens upon and security interests created under any other written instrument or agreement stating expressly that it secures the indebtedness, liabilities or obligations of Borrower under the terms of this specific agreement;

### ARTICLE 4- CONDITIONS

**4.01** **Conditions of the Initial Loan.** Lender's obligation to make the initial Loan is subject to the following conditions precedent:

(a)  Borrower has executed and delivered the Loan Documents to Lender; and Lender has executed this agreement and all other Loan Documents to which Lender is a Party;

(b)  Lender has received evidence satisfactory to Lender, of the formation and existence of all parties to the Transaction Documents other than Lender which are anything other than an individual, if any, and authorization of the individuals executing the Transaction Documents on behalf of those parties;

(c)  Lender has received all appraisals and inspection reports required by Lender, in a form and content satisfactory to Lender;

(d)  Lender has received a Borrowing Base Certificate;

(e)  Lender has received evidence satisfactory to Lender, that Borrower is in compliance with all applicable Environmental Laws (that evidence, the "Environmental Information");

(f)  Lender has received evidence satisfactory to Lender, that all regulatory approvals, permits and licenses required under Applicable Law for Borrower's business operations have been issued and are in full force and effect;

(g)  Lender has received evidence satisfactory to Lender, that the Liens granted to Lender under the Collateral Documents are valid, enforceable, properly perfected, and prior to the rights and interests of all other Persons, except those rights and interests acceptable to Lender;

(h)  Lender has received evidence satisfactory to Lender, that all policies of insurance and endorsements required by Lender or under the Loan Documents are issued by the same title insurance company and are in full force and all premiums for those policies have been paid through the date required by Lender;

(i)  all representations and warranties of all parties other than Lender in the Transaction Documents are true and correct; and

(j)  Lender has received all other documents, information and other preconditions required by Lender.

**4.02** **Additional Loans.** Lender's obligation to make each additional Loan is subject to the condition precedent that on the Drawdown Date:

(a)  Lender shall receive a Loan Request (defined in Section 2.01);

(b)  the following statements are correct (and Borrower will be deemed to represent to Lender that those representations are correct) as of the Drawdown Date:  (i) the representations and warranties in the Loan Documents are correct as though made on that date; (ii) no Event of Default or event which, with the passage of time or the giving of notice would constitute an Event of Default, has occurred and remains uncured or would result from the additional Loan; (iii) there has been no change in the financial condition of Borrower since the effective date of this agreement, that would have a Material Adverse Effect on Borrower; and (iv) the unpaid principal amount of all outstanding Loans under the line of credit facility under which those Loans are made, together with the amount of that additional Loan does not exceed the maximum amount thereof under the terms of this agreement and

(c)  Lender has received all other documents, information and other preconditions required by Lender.

### ARTICLE 5- BORROWER REPRESENTATIONS

**5.01** **Representations.** Borrower represents to Lender that:

(a)  if Borrower is anything other than an individual, it has complied with all Applicable Laws concerning its organization, existence and the transaction of its business, and is in existence and good standing in its state of organization and each state in which it conducts its business;

(b)  the execution, delivery and performance by Borrower of each Transaction Document to which it is a Party, is within the powers and authority of Borrower and has been duly authorized;

Turner Grain Merchandising
Credit Agreement

(c)    to Borrower's knowledge, the Transaction Documents do not conflict with any Applicable Law;

(d)    each Transaction Document to which Borrower is a Party is a legal, valid and binding agreement of Borrower, enforceable against Borrower in accordance with its terms, and any instrument or agreement required thereunder, when executed and delivered to Lender, will be similarly legal, valid, binding and enforceable;

(e)    all financial statements and other reports, documents, instruments, information and forms of evidence concerning Borrower, the Collateral, or any other fact or circumstance (the "Financial Information"), delivered to Lender in connection with Borrower's application for the Loan, Lender's underwriting and approval of the Loan, or this agreement and the other Loan Documents, are accurate, correct and sufficiently complete in all material respects to provide Lender true and accurate knowledge of their subject matter, including, without limitation, all material contingent liabilities;

(f)    there has been no Material Adverse Effect as to Borrower since the effective date of the Financial Information provided to Lender;

(g)    Borrower is not the subject of any Judgment; and there is no lawsuit, tax claim or other dispute pending or to Borrower's knowledge threatened against Borrower that, if determined adverse to Borrower, is reasonably likely to have a Material Adverse Effect;

(h)    the Transaction Documents do not conflict with, nor is Borrower in default under any agreement or arrangement in effect providing for or relating to extensions of credit in respect of which Borrower is in any manner directly or contingently obligated;

(i)    Borrower has filed all tax returns (federal, state, and local) required to be filed by Borrower and has paid all taxes, assessments, and governmental charges and levies thereon, including interest and penalties;

(j)    Borrower is in compliance with all Applicable Laws (including all Environmental Laws), and there is no claim, action, proceeding or investigation pending or to Borrower's knowledge threatened against Borrower with respect to a violation of Applicable Law by Borrower;

(k)    Borrower is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code of 1986; and

(l)    there is no Event of Default or event which, with notice or lapse of time would be an Event of Default.

**5.02    Information Accurate and Complete.** Borrower's submission of any report, record or other information pertaining to the condition or operations, financial or otherwise, of Borrower, from time to time, whether or not required under this agreement, will be deemed accompanied by a representation by Borrower that the report, record or information is complete and accurate in all material respects as to the condition or operations of Borrower (and, if applicable, Borrower's Subsidiaries, Affiliates, partners, shareholders, members, or other principals), including, without limitation, all material contingent liabilities.

## ARTICLE 6 – BORROWER COVENANTS

Until such time as all Obligations have been paid in full and Lender has no obligation to make additional Loans:

**6.01    Books and Records.** Borrower shall maintain and cause each of its Subsidiaries to maintain proper books of record and account including full, true, and correct entries of all dealings and transactions relating to its and their business and activities on a cash basis, in all material respects in conformity with generally accepted accounting principles ("GAAP").

**6.02    Reporting Requirements.** Borrower shall furnish to Lender:

(a)    no later than 20 days after the end of each month, a Borrowing Base Certificate current as of the end of that month;

(b)    as soon as available, but no later than 45 days after the end of each fiscal year, a copy of Self Prepared financial statements of Jason & Felicia Coleman and Dale C. & Elizabeth Bartlett for that period;

(c)    as soon as available, but no later than 45 days after the end of each fiscal year, a copy of CPA Compiled financial statements of Turner Grain Merchandising, Inc. for that period;

(d)    as soon as available, but no later than 30 days after filing, copies of federal income tax returns filed by Borrower, including all schedules and exhibits and any extensions of the filing date;

(e)    promptly upon sending or receipt, copies of any management letters and correspondence relating to management letters, sent to or received from Borrower's accountants; and

(f)    promptly upon receipt, copies of all notices, orders, or other communications regarding (i) any enforcement action by any Governmental Authority relating to health, safety, the environment, or any Hazardous Substances with regard to Borrower's property, activities, or operations, or (ii) any claim against Borrower regarding Hazardous Substances;

(g)    notice of the occurrence of any of the following, promptly, but in any event no later than five days after such occurrence: (i) any lawsuit, tax claim or other dispute if filed or threatened against Borrower in an amount greater than $100,000.00; (ii) any substantial dispute between Borrower and any Governmental Authority; (iii) the failure by Borrower to comply with the terms and provisions of this agreement; (iv) any Material Adverse Effect as to Borrower; or (vi) any change in Borrower's name, legal structure, place of business, or chief executive office;

(h)    if any financial statement required under this agreement has been compiled, reviewed or audited, a copy of that compiled, reviewed or audited financial statement, along with a copy of any accompanying accountant's report or opinion; and

(i)    promptly upon Lender's request, all other books, records, statements, lists of property and accounts, budgets, forecasts, reports, records or other information pertaining to the condition or operations of Borrower requested by Lender.

**6.03    Maintenance of Assets.** Borrower shall maintain and preserve all rights, privileges, and franchises Borrower now has; and make any repairs, renewals, or replacements to keep Borrower's properties in good working condition.

**6.04    Existence and Good Standing.** If Borrower is anything other than an individual, Borrower shall preserve and maintain its existence and good standing in the jurisdiction of its formation, and qualify and remain qualified to conduct its business in each jurisdiction in which such qualification is required;

**6.05    Change in Business or Organizational Structure.** Borrower shall not engage in any material line of business substantially different from, or unrelated to, those lines of business conducted by Borrower and its Subsidiaries on the date hereof; and if Borrower is anything other than an individual, Borrower shall not (a) form or otherwise acquire any Subsidiary, unless that Subsidiary executes and delivers to Lender a guaranty of

Turner Grain Merchandising
Credit Agreement

4

all of the Obligations and all other Instruments and agreements required by Lender; or (b) merge, dissolve, liquidate, consolidate with or into another Person, or dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person.

**6.06**    **Compliance with Laws.** Borrower shall comply in all respects with all Applicable Laws and pay before delinquency, all taxes, assessments, and governmental charges imposed upon Borrower or its property.

**6.07**    **Inspections.** Borrower shall, at any reasonable time and from time to time, permit Lender or any of its agents or representatives to examine and make copies of and abstracts from the records and books of, and visit the properties of, Borrower and to discuss the affairs, finances, and accounts of Borrower with (if Borrower is other than an individual) officers, directors, partners, or managers or Borrower, as applicable; Borrower's independent accountants; and any other Person dealing with Borrower.

**6.08**    **Insurance.**

(a)       Borrower shall maintain, or cause to be maintained, all risk property damage insurance policies covering tangible property comprising the Collateral for the full insurable value on a replacement cost basis; and such additional insurance as required by Lender or any Swap Counterparty from time to time.

(b)       All policies of insurance required under the Transaction Documents must be issued by companies approved by Lender and the Swap Counterparties, and must be acceptable to Lender and the Swap Counterparties as to amounts, forms, risk coverages, deductibles, expiration dates, and loss payable and cancellation provisions. In addition, each required policy must contain such endorsements as Lender or the Swap Counterparties may require and must provide that all proceeds be payable to Lender and the Swap Counterparties to the extent of their respective interests.

(c)       If and whenever Lender or a Swap Counterparty believes that any required insurance is not in effect, Lender or that Swap Counterparty may (but will not be obligated to) procure that insurance at Borrower's expense. Borrower shall reimburse Lender and the Swap Counterparties, on demand, for all premiums on that insurance paid by Lender or the Swap Counterparties, respectively.

**6.09**    **Arms' Length Dealing.** Except for *de minimis* transactions, Borrower shall not enter into any transaction of any kind with any family member, Subsidiary or Affiliate, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to Borrower as would be obtainable by any Borrower at the time in a comparable arm's length transaction with a Person other than a family member, Subsidiary or Affiliate.

**6.10**    **Use of the Loans.** Borrower shall not use the Loans (a) for personal, family or household purposes, or (b) to purchase or carry "margin stock" (as that term is defined in Regulation U of the Board of Governors of the Federal Reserve System) or to invest in other Persons for the purpose of carrying any such "margin stock" or to reduce or retire any indebtedness incurred for that purpose.

**6.11**    **ERISA Plans.** Borrower shall promptly pay and cause all Subsidiaries to pay contributions adequate to meet not less than the minimum funding standards under ERISA with respect to each and every Plan; file each annual report required to be filed pursuant to ERISA in connection with each Plan for each year; and notify Lender within ten days following the occurrence of any Reportable Event that might constitute grounds for termination of any capital Plan by the Pension Benefit Guaranty Corporation or for the appointment by the appropriate United States District Court of a trustee to administer any Plan. "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time. Capitalized terms in this section shall have the meanings defined within ERISA.

**6.12**    **Legal Fees; Costs.** Borrower shall pay the following: (a) costs, expenses and Legal Fees paid or incurred in connection with the collection or enforcement of the Transaction Documents, whether or not suit is filed; (b) costs and Legal Fees paid or incurred in connection with any Insolvency Proceeding involving a claim under the Transaction Documents; (c) costs, expenses and Legal Fees incurred to protect the liens and security interests under the Collateral Documents; and (d) costs of suit and such sum as the court may adjudge as Legal Fees in any action to enforce payment of the Notes or any part thereof.

**6.13**    **Inspection.** Annual inspection by RMT due by December 15th.

**6.14**    **Other Acts.** Upon request by Lender, Borrower shall cooperate with Lender for the purposes of, and perform all acts which may be necessary or advisable to perfect any Lien granted under this agreement or the Collateral Documents, or to carry out the intent of the Transaction Documents.

## ARTICLE 7 - EVENTS OF DEFAULT AND REMEDIES

**7.01**    **Events of Default.** Upon Lender's election, the following each will be an event of default under this agreement (an "Event of Default"):

(a)       any payment required under the Loan Documents is not made by the first Business Day on or after the fourth calendar day following its scheduled due date;

(b)       the Financial Information or any representation in the Loan Documents (including any representation pursuant to Section 5.02) is materially incorrect or misleading;

(c)       Borrower does not (i) pay (or cause payment of) all taxes assessed on the Collateral prior to the date when delinquent; (ii) maintain (or cause to be maintained) all policies of insurance required under the Transaction Documents and pay (or cause payment of) all premiums for that insurance on or prior to the date when due; and (iii) maintain the Collateral (or cause the Collateral to be maintained) in good condition and repair, all in accordance with the terms and conditions of the Transaction Documents;

(d)       the death of (i) any Borrower who is an individual, (ii) if Borrower is a partnership, any general partner of that partnership who is an individual, or (iii) if Borrower is the trustee under a trust acting in that capacity, any individual trustor under the trust;

(e)       the filing of any federal tax lien against Borrower, any member or general partner of Borrower, or against the Collateral and same is not discharged of record within 30 days after the date filed;

(f)       an Insolvency Proceeding is initiated by Borrower; or any Insolvency Proceeding initiated against Borrower by another Person is not discharged within 60 days after filing;

Turner Grain Merchandising
Credit Agreement

(g)       Borrower or any Subsidiary are or become subject to a Judgment or Judgments: (i) for the payment of money in an aggregate amount (as to all such Judgments or orders) exceeding $50,000.00, which are not covered by independent third-party insurance (as to which the insurer does not dispute coverage, or (ii) that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon any such Judgment, or (B) there is a period of ten consecutive days during which a stay of enforcement of any such Judgment, by reason of a pending appeal or otherwise, is not in effect;

(h)       any "Event of Default" as that term is defined in the Loan Documents other than this agreement which is not cured within any applicable cure or grace period;

(i)       any default in the payment or performance of a term or condition of any credit agreement, note, security agreement, mortgage, deed of trust, deed to secure debt, or other agreement or instrument evidencing or securing any other indebtedness, liabilities or obligations of Borrower to Lender or Rabobank International, Rabobank, N.A., or any other Affiliate of Lender, or any Swap Counterparty;

(j)       any default termination event or other similar event under any Hedging Agreement which is not cured within any applicable cure or grace period;

(k)       any Material Adverse Effect as to Borrower;

(l)       for more than ten days after notice from Lender, Borrower is in default under any term, covenant or condition of this agreement not previously described in this Section 7.01, which can be cured by the payment of a sum of money; and

(m)       for 30 days after notice from Lender, Borrower is in default under any term, covenant or condition of this agreement not previously described in this Section 7.01; provided that if (i) it is reasonably certain that the default cannot be cured by Borrower within that 30 day period and (ii) Borrower has commenced curing that default within that 30 day period and thereafter diligently and expeditiously proceeds to cure that default, then that 30 day period will be extended for so long as reasonably required by Borrower in the exercise of due diligence to cure that default, up to a maximum of 90 days after the notice to Borrower of the Event of Default.

7.02       **Remedies.**  Upon the occurrence of an Event of Default, Lender may: (a) without notice to Borrower, decline Loan Requests; (b) declare all Loan Obligations due and payable, without presentment, notice of intent to accelerate or notice of acceleration, demand, protest or further notice of any kind, all of which are expressly waived by Borrower; and (c) exercise all other rights and remedies afforded to Lender under the Loan Documents or Applicable Law or in equity; except that upon an actual or deemed entry of an order for relief with respect to Borrower or any of its Subsidiaries in any Insolvency Proceeding, (i) any obligation of Lender to make additional Loans shall automatically be terminated and (ii) all Loan Obligations shall automatically become due and payable, without presentment, demand, protest or any notice of any kind, all of which are expressly waived by Borrower.

## ARTICLE 8 - NOTICES

All requests, notices, approvals, consents, and other communications between the Parties (collectively, "Notices") under the terms and conditions of the Loan Documents must be in writing and mailed or delivered to the address specified in that Loan Document, or to the address designated by any Party in a notice to the other Parties; and in the case of any other Person, to the address designated by that Person in a notice to Borrower and Lender.  All Notices will be deemed to be given or made upon the earlier to occur of (a) actual receipt by the intended recipient or (b) (i) if delivered by hand or by courier, upon delivery; or (ii) if delivered by mail, four Business Days after deposit in the mails, properly addressed, postage prepaid; except that notices and other communications to Lender shall not be effective until actually received by Lender.  Borrower requests that Lender accept, and Lender may, at its option, accept and is entitled to rely and act upon any Notices purportedly given by or on behalf of Borrower, even if not made in a manner specified herein (including Notices made verbally, by telephone, telefacsimile, email, or other electronic means of communication), were incomplete or were not preceded or followed by any other form of Notice specified herein, or the terms thereof, as understood by the recipient, varied from any confirmation thereof.  All telephonic Notices to and other telephonic communications with Lender may be recorded by Lender, and each Party consents to such recording.

## ARTICLE 9 – GENERAL DEFINITIONS, ACCOUNTING MATTERS AND DRAFTING CONVENTIONS

9.01       **Defined Terms.**  Capitalized terms defined in this section are used in this agreement as so defined. Except as otherwise defined in this agreement, or unless the context otherwise requires, each term that is used in this agreement which is defined in Article 9 of the UCC shall have the meaning ascribed to that term in Article 9 of the UCC.

"Adjust" means to increase or decrease; "Adjusted" means increased or decreased; and "Adjustment" means an increase or decrease.

"Adjustment Date" means each date on which the rate of interest on a LIBOR Indexed Rate Loan is or may be Adjusted by Lender pursuant to this agreement.

"Affiliate" of a Person other than an individual means another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Applicable Law" means all existing and future laws, orders, ordinances, rules and regulations of or by a Governmental Authority; except that in determining the Maximum Rate, Applicable Law shall mean those laws, orders, ordinances, rules and regulations in effect as of the date hereof or if there is a change in Applicable Law which (a) permits Lender to charge interest on amounts which Lender would not otherwise be permitted to charge interest, or (b) increases the permissible rate of interest, then the new Applicable Law as of its effective date.

"Borrower" shall have the meaning specified in the preamble of this agreement.

"Borrowing Base Certificate" means a certificate in a form required by Lender, properly completed and certified by Borrower, for purposes of calculating the Borrowing Base, together with all supporting documentation required by Lender.

"Business Day" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized or required to close under the Applicable Laws of the State of Iowa or Missouri, or are in fact closed in the State of Iowa or Missouri.

"Closing" means (a) the acknowledgement by Lender that all conditions precedent to the initial Loan are satisfied or waived in accordance with this agreement, or (b) the initial Loan is made, whichever is earlier.

"Closing Date" means the date of the Closing.

Turner Grain Merchandising
Credit Agreement

6

"Collateral Agency Agreement" means the internal collateral agency agreement between Rabo Agrifinance, Inc., Rabobank International, and Rabobank, N.A. governing their rights and obligations permitting Rabo Agrifinance, Inc. to act as a collateral agent in servicing the Loan.

"Control" of a Person other than an individual means the power to direct the management and policies of that Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"CPA Compiled" means compiled by a CPA, including a compilation report.

"Drawdown Date" means in the case of any Loan, the date on which that Loan is made.

"Environmental Law" means all Applicable Laws relating to or imposing liability or standards of conduct concerning protection of health or the environment.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Hazardous Substance" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "caustic," "pollutant," or "contaminant" or a similar designation or regulation under any Environmental Law, and shall also include, without limitation, asbestos, PCBs, petroleum, petroleum products, and natural gas.

"Hedging Agreement" means any interest rate swap, interest rate caps, interest rate collars or other similar agreement between Borrower and a Swap Counterparty, for the purpose of fixing or limiting interest expense, or any foreign exchange, currency hedging, commodity hedging, security hedging or other agreement between Borrower and a Swap Counterparty, for the purpose of limiting the market risk of holding currency, a security or a commodity in either the cash or futures markets.

"Hedging Obligations" means all indebtedness, liabilities and obligations of Borrower under any Hedging Agreement, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several.

"Indemnified RNA Liabilities" means all indebtedness, liabilities and obligations of Borrower to Rabobank, N.A. ("RNA"), in connection with banking products and services provided by RNA to Borrower, if any, including all obligations of Borrower to RNA as a result of: (a) deposits of credit items that are returned by the issuing bank; (b) ACH debit items originated by Borrower which settle with insufficient funds in Borrower's deposit account; (c) letters of credit issued by RNA for the benefit of Borrower; (d) trade finance services; and (e) all service charges and fees posted to the account.

"Insolvency Proceeding" means the insolvency of a Person, the appointment of a receiver of any part of Person's property, an assignment by a Person for the benefit of creditors, or the commencement of any proceeding under the Federal Bankruptcy Code or any other bankruptcy or insolvency law, by or against a Person.

"Interest Payment Date" means a date on which regularly scheduled payments of interest are due.

"Interest Period" means with respect to a LIBOR Indexed Rate Loan, each period commencing on the date that the LIBOR Indexed Rate Loan, respectively, is made or the applicable rate is recalculated, until the next Adjustment Date or, if earlier, the respective Maturity Date.

"Judgment" means a judgment, order, writ, injunction, decree, or rule of any court, arbitrator, or Governmental Authority.

"Legal Fees" means any and all counsel, attorney, paralegal and law clerk fees and disbursements, including, but not limited to fees and disbursements at the pre-trial, trial, appellate, discretionary review, or any other level, incurred or paid by Lender in protecting and enforcing its rights and interests under the Loan Documents.

"Lender" shall have the meaning specified in the preamble of this agreement and any successors and assigns of any of its rights and obligations under this agreement.

"LIBOR" means, for any Interest Period, the rate of interest published in the "Money Rates" section of The Wall Street Journal (or if The Wall Street Journal is not available or does not publish that rate, any other authoritative source of that rate, selected by Lender from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in an amount equal to the Loan in the London interbank market at approximately 11:00 a.m., London time) on the London Banking Day immediately preceding the commencement of the Interest Period, as the rate for dollar deposits with a maturity comparable to the applicable contract period; provided, that LIBOR may be Adjusted from time to time in Lender's discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs.

"LIBOR Indexed Rate Loan" means a Loan which bears interest at the LIBOR Indexed Rate.

"Lien" means any mortgage, pledge, assignment, deposit arrangement, privilege, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Loan Documents" means this agreement, the Note, the Collateral Documents, and all other agreements and instruments required by Lender for purposes of evidencing or securing the Loans.

"Loan Obligations" means all indebtedness, liabilities and obligations of Borrower to Lender arising pursuant to any of the Loan Documents, whether now existing or hereafter arising, whether direct, indirect, related, unrelated, fixed, contingent, liquidated, unliquidated, joint, several, or joint and several.

"London Banking Day" means a day on which banks are open for dealings in dollar deposits in the London interbank market.

"Losses" means any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, Judgments, awards, amounts paid in settlement of whatever kind or nature (including Legal Fees).

"Material Adverse Effect" means any set of circumstances or events which (a) has or could reasonably be expected to have any material adverse effect as to the validity or enforceability of any Transaction Document or any material term or condition therein against the applicable Person;

Turner Grain Merchandising
Credit Agreement

(b) is or could reasonably be expected to be material and adverse to the financial condition, business assets, operations, or property of the applicable Person; or (c) materially impairs or could reasonably be expected to materially impair the ability of the applicable Person to perform the Obligations.

"Maximum Rate" means that rate per annum which, under Applicable Law, may be charged without subjecting Lender to civil or criminal liability, or limiting Lender's rights under the Loan Documents as a result of being in excess of the maximum interest rate which Borrower is permitted to contract or agree to pay; except that the Maximum Rate on any amount upon which Lender is not permitted to charge interest will be zero percent.

"Obligations" means the Loan Obligations and the Hedging Obligations.

"Party" refers only to a named party to this agreement or another Loan Document, as the context requires.

"Person" means an individual, a corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or other business entity, or a government or any agency or political subdivision thereof.

"Prepay" means to make a Prepayment.

"Prepayment" means a payment of all or a portion of the unpaid principal balance of a Loan prior to the date when due, whether voluntary, by reason of acceleration, or otherwise.

"Prime Rate" means for any day the highest rate published from time to time in the "Money Rates" section of *The Wall Street Journal* as the Prime Rate for that day (or, if *The Wall Street Journal* is not available, any other authoritative source of that rate selected by Lender).

"Rabobank International" means Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. (trading as "Rabobank International"), a foreign banking organization organized as a cooperative bank under the laws of The Netherlands.

"Self Prepared" means for the financial statement of any Person, prepared by that Person, and not compiled, reviewed or audited by a certified public accountant.

"Subsidiary" of a Person which is anything other than an individual means a business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly by that Person. Unless otherwise specified, all references to a "Subsidiary" or to "Subsidiaries" shall refer to any Subsidiary or Subsidiaries, if any.

"Swap Counterparty" means any party to a Hedging Agreement which is Rabobank International or an Affiliate of Rabobank International.

"Transaction Documents" means the Loan Documents and all Hedging Agreements.

"UCC" means the Uniform Commercial Code in the Governing Law State.

**9.02    Accounting Matters.** All accounting terms not specifically defined herein will be construed in accordance with GAAP. All financial covenants applicable to an individual will be calculated based on that individual's business, excluding personal assets and liabilities. Borrower will not change the manner in which either the last day of its fiscal year or the last days of the first three fiscal quarters of its fiscal years is calculated. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document Lender may amend that ratio or requirement to preserve the original intent thereof in light of that change.

**9.03    Drafting Conventions.** Unless expressly stated therein or the context otherwise requires, the Loan Documents will be interpreted in accordance with the following (the "Drafting Conventions"): (a) the words "include," "includes," and "including" are to be read as if they were followed by the phrase "without limitation"; (b) unless otherwise expressly stated, terms and provisions applicable to two or more Persons shall apply on an individual, as well as collective basis; (c) headings and captions are provided for convenience only and do not affect the meaning of the text which follows; (d) references to an agreement or instrument means that agreement or instrument, together with all extensions, renewals, modifications, substitutions and amendments thereof, subject to any restrictions thereon in that agreement or instrument or in the Loan Documents; (E) ANY REPORT OR DOCUMENT TO BE RECEIVED BY LENDER SHALL BE SATISFACTORY IN FORM AND CONTENT TO LENDER; (F) WHEREVER (i) LENDER EXERCISES ANY RIGHT GIVEN TO IT TO APPROVE OR DISAPPROVE, (II) ANY ARRANGEMENT OR TERM IS TO BE SATISFACTORY TO LENDER, OR (III) ANY OTHER DECISION OR DETERMINATION IS TO BE MADE BY LENDER, THEN EXCEPT AS MAY BE OTHERWISE EXPRESSLY AND SPECIFICALLY PROVIDED THEREIN, THE DECISION TO APPROVE OR DISAPPROVE, ALL DECISIONS THAT ARRANGEMENTS OR TERMS ARE SATISFACTORY OR NOT SATISFACTORY, AND ALL OTHER DECISIONS AND DETERMINATIONS MADE BY LENDER, SHALL BE IN THE SOLE DISCRETION OF LENDER, WITHOUT REGARD FOR THE ADEQUACY OF ANY SECURITY FOR THE OBLIGATIONS; (g) whenever by the terms of the Loan Documents, Borrower is prohibited from taking an action or permitting the occurrence of some circumstance, Borrower shall not, directly or indirectly take that action or permit that circumstance, or directly or indirectly permit any Subsidiary to take that action or permit that circumstance; (h) evidence of the occurrence or non-occurrence of any event, or the existence or non-existence of any circumstance to be delivered to Lender must be in a form satisfactory to Lender; (i) unless specified otherwise, references to a statute or regulation means that statute or regulation as amended or supplemented from time to time and any corresponding provisions of successor statutes or regulations; (j) unless otherwise specified, all references to a time of day are references to the time in St. Louis, Missouri; (k) references to "month" or "year" are references to a calendar month or calendar year, respectively; (l) if any date specified in this agreement as a date for taking action falls on a day that is not a Business Day, then that action may be taken on the next Business Day; (m) a pronoun used in referring generally to any member of a class of Persons, or Persons and things, applies to each member of that class, whether of the masculine, feminine, or neuter gender; (n) references to "articles," "sections," "subsections," "paragraphs," "exhibits," and "schedules" reference articles, sections, subsections, paragraphs, exhibits, and schedules, respectively, of this agreement unless otherwise specifically provided; (o) the words "hereof," "herein," "hereunder," and "hereby" refer to this agreement as a whole and not to any particular provision of this agreement; (p) the definitions in this agreement apply equally to both singular and plural forms of the terms defined; and (q) for purposes of computing periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding".

## ARTICLE 10 - MISCELLANEOUS

**10.01    Entire Agreement.** This agreement and the other Loan Documents, collectively: (i) represent the sum of the understandings and agreements between Lender and Borrower concerning this credit; (ii) replace any prior oral or written agreements between Lender and Borrower concerning this credit; and (iii) are intended by Lender and Borrower as the final, complete and exclusive statement of the terms agreed to by them. In the event of any conflict between this agreement and any other agreements required by this agreement, this agreement will prevail.

**10.02    Joint and Several Obligations.** If Borrower consists of more than one Person, each Borrower (a) expressly acknowledges that it has benefited and will benefit, directly and indirectly, from each Loan and acknowledges and undertakes, together with the other Borrowers, joint and

Turner Grain Merchandising
Credit Agreement

several liability for the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all Loan Obligations; (b) acknowledges that this agreement is the independent and several obligation of each Borrower and may be enforced against each Borrower separately, whether or not enforcement of any right or remedy hereunder has been sought against any other Borrower; and (c) agrees that its liability hereunder and under any other Loan Document is absolute, unconditional, continuing and irrevocable.  BORROWER EXPRESSLY WAIVES ANY REQUIREMENT THAT LENDER EXHAUST ANY RIGHT, POWER OR REMEDY AND PROCEED AGAINST THE OTHER BORROWERS UNDER THIS AGREEMENT, OR ANY OTHER LOAN DOCUMENTS, OR AGAINST ANY OTHER PERSON UNDER ANY GUARANTY OF, OR SECURITY FOR, ANY OF THE OBLIGATIONS.

**10.03    Authority to Bind Borrower.**  If Borrower is comprised of multiple Persons, any Person comprising Borrower is authorized to bind all parties comprising Borrower.  Without limitation of the foregoing, Lender may require any Loan Request or other request, authorization, or other action by or on behalf of Borrower be by one or more individuals designated in writing by the parties comprising Borrower (a "Designated Person").  Lender may, at any time and without notice, waive any prior requirement that requests, authorizations, or other actions be taken only by a Designated Person.

**10.04    Binding Effect; Successors and Assigns.**  The Loan Documents will inure to the benefit of and be binding upon the parties and their respective successors and assigns.

**10.05    Assignment; Participations.**  Borrower shall not assign its rights or obligations hereunder without Lender's consent.  Lender may assign or sell participations in all or any portion of its interest in the Loans or under the Loan Documents to any Person.  Lender may disclose to any actual or potential assignee or participant any information that Borrower has delivered to Lender in connection with the Loan Documents; and Borrower shall cooperate fully with Lender in providing that information.  If Lender assigns or sells a participation in the Loans or the Loan Documents, the purchaser will have the right of set-off against Borrower.

**10.06    Severability.**  Any provision of any Loan Document which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of that Loan Document or affecting the validity or enforceability of that provision in any other jurisdiction; except that if such provision relates to the payment of any monetary sum, then Lender may, at its option, declare all Loan Obligations immediately due and payable.

**10.07    Amendments in Writing.**  The Loan Documents may not be amended, changed, modified, altered or terminated without the prior written consent of all parties to the respective Loan Document.

**10.08    Governing Law.**  Except as expressly stated therein, the Loan Documents will be governed exclusively by the Applicable Laws of the State of Iowa (the "Governing Law State") without regard or reference to its conflict of laws principles.  Borrower understands that the laws of the Governing Law State may differ from the laws of the State where Borrower resides or otherwise is located or where the Collateral is located.  Borrower understands, agrees and acknowledges that (a) this agreement and the transaction evidenced hereby have significant and substantial contacts with the Governing Law State, (b) it is convenient to Borrower and Lender to select the law of the Governing Law State to govern this agreement and the transactions evidenced hereby, (c) the transactions evidenced by this agreement bear a reasonable connection to the laws of the Governing Law State, (d) the choice of the internal laws of the Governing Law State was made for good and valid reasons, and (e) the choice of the Governing Law State constitutes good and valuable consideration for Lender to enter into this agreement and Lender has entered into this agreement in reliance on this choice.

**10.09    JURISDICTION AND VENUE.**  BORROWER IRREVOCABLY AGREES THAT, AT THE OPTION OF LENDER, ALL ACTIONS, PROCEEDINGS OR COUNTERCLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT WILL BE LITIGATED IN THE IOWA DISTRICT COURT FOR BLACK HAWK COUNTY, IOWA, OR THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF IOWA.  BORROWER IRREVOCABLY CONSENTS TO SERVICE, JURISDICTION, AND VENUE OF THOSE COURTS FOR ALL SUCH ACTIONS, PROCEEDINGS AND COUNTERCLAIMS AND WAIVES ANY OTHER VENUE TO WHICH IT MIGHT BE ENTITLED BY VIRTUE OF DOMICILE, HABITUAL RESIDENCE OR OTHERWISE.

**10.10    Counterpart Execution.**  The Loan Documents may be executed in counterparts, each of which will be an original and all of which together are deemed one and the same instrument.

**10.11    Necessary Action.**  Lender is authorized to execute any other documents or take any other actions necessary to effectuate the Loan Documents and the consummation of the transactions contemplated therein.

**10.12    Credit Report.**  Lender is authorized to order a credit report and verify all other credit information, including past and present loans and standard references from time to time to evaluate the creditworthiness of Borrower.  Without limitation, a copy of the consent for release of information, general authorization or similar document on file with Lender shall authorize third Persons to provide the information requested from time to time.

**10.13    Consent to Disclosure.**  Borrower agrees and consents to the communication and disclosure of all information in respect of the transaction governed by this agreement and all matters incidental hereto and thereto by Lender: (i) to the head office and all other branches and Affiliates of Lender, provided such communication and disclosure is for risk management and administrative purposes; and (ii) as required by any Applicable Law or regulation or any court or regulatory or other authority of competent jurisdiction.

**10.14    No Construction Against Drafter.**  Each Party has participated in negotiating and drafting this agreement, so if an ambiguity or a question of intent or interpretation arises, this agreement is to be construed as if the parties had drafted it jointly, as opposed to being construed against a Party because it was responsible for drafting one or more provisions of this agreement.

**10.15    INDEMNIFICATION.**  BORROWER SHALL DEFEND, INDEMNIFY AND HOLD LENDER AND ITS OFFICERS, DIRECTORS, EMPLOYEES, PARTNERS, AGENTS AND ATTORNEYS (THE "INDEMNIFIED PERSONS") HARMLESS AGAINST ANY AND ALL LOSSES OF ANY KIND OR NATURE WHATSOEVER THAT MAY BE IMPOSED ON, INCURRED BY, OR ASSERTED AGAINST THE INDEMNIFIED PERSONS: (I) INCURRED AS A RESULT OF THE FAILURE BY BORROWER TO BORROW THE AMOUNT SPECIFIED IN A LOAN REQUEST (INCLUDING ANY FAILURE RESULTING FROM THE FAILURE TO FULFILL THE APPLICABLE CONDITIONS PRECEDENT), INCLUDING ANY LOSS OF ANTICIPATED PROFITS AND LOSSES BY REASON OF THE LIQUIDATION OR REEMPLOYMENT OF FUNDS ACQUIRED BY LENDER TO FUND THE LOAN; (II) AS A RESULT OF ITS ACTS OR OMISSIONS WHICH RESULT FROM COMMUNICATIONS GIVEN OR PURPORTED TO BE GIVEN, BY BORROWER OR ANY DESIGNATED PERSON, WHICH ARE INTERRUPTED, WHICH ARE MISUNDERSTOOD, OR WHICH ARE IN FACT FROM UNAUTHORIZED PERSONS; (III) ARISING OUT OF OR RESULTING FROM THE VIOLATION BY BORROWER OF ANY ENVIRONMENTAL LAW; (IV) RESULTING FROM THE RELIANCE BY LENDER ON EACH NOTICE PURPORTEDLY GIVEN BY OR ON BEHALF OF BORROWER; (V) INCURRED BY LENDER UNDER ANY GUARANTY, INDEMNITY OR THE LIKE GIVEN TO RABOBANK, N.A., WITH RESPECT TO INDEMNIFIED

Turner Grain Merchandising
Credit Agreement

RNA LIABILITIES; AND (VI) ARISING OUT OF CLAIMS ASSERTED AGAINST THE INDEMNIFIED PERSONS AS A RESULT OF LENDER BEING PARTY TO THIS AGREEMENT OR THE TRANSACTIONS CONSUMMATED PURSUANT TO THIS AGREEMENT; EXCEPT THAT BORROWER SHALL HAVE NO OBLIGATION TO AN INDEMNIFIED PERSON UNDER THIS SECTION WITH RESPECT TO LOSSES RESULTING FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THAT INDEMNIFIED PERSON AS DETERMINED BY A COURT OF COMPETENT JURISDICTION. IF AND TO THE EXTENT THAT ANY INDEMNITY UNDER THE LOAN DOCUMENTS IN FAVOR OF INDEMNIFIED PARTIES IS UNENFORCEABLE FOR ANY REASON, BORROWER SHALL MAKE THE MAXIMUM CONTRIBUTION TO THE PAYMENT AND SATISFACTION THEREOF WHICH IS PERMISSIBLE UNDER APPLICABLE LAW.  ALL INDEMNITIES UNDER THE LOAN DOCUMENTS IN FAVOR OF INDEMNIFIED PARTIES SHALL SURVIVE THE TERMINATION OF THIS AGREEMENT.

**10.16    COLLATERAL AGENCY AGREEMENT.** The Loan Documents are subject to the terms of the Collateral Agency Agreement.

**10.17    WAIVER OF TRIAL BY JURY.  THE PARTIES (A) COVENANT AND AGREE NOT TO ELECT A TRIAL BY JURY IN ANY ACTION OR PROCEEDING FOR THE RESOLUTION OF ANY CONTROVERSY OR CLAIM THAT ARISES OUT OF OR RELATES TO: (I) THIS AGREEMENT; OR (II) ANY SECURED OBLIGATION DOCUMENT, WHETHER ARISING IN CONTRACT, TORT OR BY STATUTE (INDIVIDUALLY AND COLLECTIVELY, A "CONTROVERSY OR CLAIM"); AND, (B) TO THE EXTENT PERMITTED BY APPLICABLE LAW, WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY CONTROVERSY OR CLAIM TO THE EXTENT SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THE PROVISIONS OF THIS SECTION ARE GIVEN KNOWINGLY AND VOLUNTARILY, AND ARE A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THE SECURED OBLIGATION DOCUMENTS AND THE SWAP COUNTERPARTIES ENTERING INTO THE HEDGING AGREEMENTS.**

**10.18    BALLOON PAYMENT.** THIS AGREEMENT PROVIDES FOR A BALLOON PAYMENT.  BORROWER ACKNOWLEDGES THAT LENDER HAS NOT AGREED TO REFINANCE THAT PAYMENT.

**10.19    Office of Foreign Assets Control; Patriot Act; Anti-Corruption.** Without limiting the provisions of any other provision hereof above, the Borrower shall, and the Borrower shall cause each of its Subsidiaries to, (1) ensure that no Person who owns a controlling interest in or otherwise controls such Person shall be listed on the Specially Designated Nationals and Blocked Person List or other similar lists maintained by the Office of Foreign Assets Control ("OFAC"), the Department of the Treasury or included in any Executive Orders, (2) not use or permit the use of the proceeds of the Loans to violate any of the foreign asset control regulations of OFAC or any enabling statute or Executive Order relating thereto, (3) comply with all applicable Bank Secrecy Act laws and regulations, as amended, and (4) comply with all applicable anti-corruption laws and maintain policies and procedures designed to promote and achieve compliance with such laws.  As required by federal law and each Lender's policies and practices, each Lender may need to obtain, verify and record certain customer identification information and documentation in connection with opening or maintaining accounts, or establishing or continuing to provide services.

**10.20    IMPORTANT: READ BEFORE SIGNING.  THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE.  NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.**

**10.21    Business Loans.** Borrower acknowledges that the proceeds of the Loans are primarily for agricultural, commercial, investment or business purposes, and are not for a consumer transaction.

The parties have signed this agreement effective as of the day and year first written above.

**BORROWER**

Address for notices:

411 North Main
Brinkley, Arkansas 72021
Attention: Jason Coleman & Dale Bartlett

Alternate address for notice by U.S. Mail:

P.O. Box 756
Marvell, Arkansas 72366
Attention: Jason Coleman & Dale Bartlett

411 North Main
Brinkley, Arkansas 72021
Attention: Jason Coleman & Dale Bartlett

Alternate address for notice by U.S. Mail:

P.O. Box 756
Marvell, Arkansas 72366
Attention: Jason Coleman & Dale Bartlett

Address for notices:

1907 South Grand Avenue
Brinkley, Arkansas 72021

Address for notices:

7102 Highway 1S
Marvell, Arkansas 72366

**TURNER GRAIN MERCHANDISING, INC.**, an Arkansas corporation

By: _____
    DALE C. BARTLETT
    President


By: _____
    JASON T. COLEMAN
    Secretary


_____
**JASON T. COLEMAN**

_____
**DALE C. BARTLETT**

Address for notices:

12443 Olive Blvd, Suite 50
St. Louis, MO 63141
Attention:  Customer Service Representative

**LENDER**

**RABO AGRIFINANCE, INC.**

By: _____

Name: _____

Title: _____

Turner Grain Merchandising

10908500/JO

## LINE OF CREDIT NOTE

$1,000,000.00

January 2, 2014

FOR VALUE RECEIVED, the undersigned (individually and collectively, "Borrower"), hereby promise to pay to the order of RABO AGRIFINANCE, INC., a Delaware corporation ("Lender") the principal sum of One Million Dollars and No Cents ($1,000,000.00) or, if less, the aggregate principal sum of all Line of Credit Loans, and interest at the rate specified in the Credit Agreement between Borrower and Lender dated as of the date of this note (the "Credit Agreement"). Principal and interest are payable to Lender at the times specified in the Credit Agreement. All payments shall be made to Lender in lawful money of the United States of America at 12443 Olive Blvd, Suite 50, St. Louis, MO 63141, or such other place as Lender directs, in same day funds. Each capitalized term used in this note that is defined in the Credit Agreement will have the meaning specified in the Credit Agreement. This note will be interpreted in accordance with the Drafting Conventions.

This note is referred to in, and is subject to the terms and conditions of the Credit Agreement. Without limitation, the Credit Agreement (i) provides for the making of Line of Credit Loans by Lender to Borrower from time to time in an aggregate amount not to exceed at any time outstanding the amount specified above, and (ii) contains provisions for acceleration of the maturity hereof upon the occurrence of certain stated events.

This note is secured by the Collateral Documents and all Liens upon and security interests created under any other written instrument or agreement stating expressly that it secures the indebtedness, liabilities or obligations of Borrower under the terms and conditions of the Credit Agreement.

Borrower has signed this note effective as of the day and year first written above.

### BORROWER

**TURNER GRAIN MERCHANDISING, INC.**, an Arkansas corporation

By: _____

DALE C. BARTLETT
President

By: _____

JASON T. COLEMAN
Secretary

JASON T. COLEMAN

DALE C. BARTLETT

Line of Credit Note
Turner Grain Merchandising

1



Turner Grain Merchandising

Line of Credit: 10908500/JO

## SECURITY AGREEMENT

This agreement is dated as of January 2, 2014. It is between TURNER GRAIN MERCHANDISING, INC., an Arkansas corporation ("Grantor"), and RABO AGRIFINANCE, INC., a Delaware corporation, as agent for itself and the other Secured Parties (defined herein) under the Collateral Agency Agreement (defined herein; and Rabo Agrifinance, Inc., in that capacity, "Collateral Agent").

RABO AGRIFINANCE, INC., a Delaware corporation, as Lender ("Lender") has extended credit to Grantor, Jason T. Coleman and Dale C. Bartlett (individually and collectively, "Borrower") under the terms and conditions of the Credit Agreement between Borrower and Lender dated as of the date of this agreement (the "Credit Agreement"). Each capitalized term used in this agreement that is defined in the Credit Agreement and not defined in this agreement will have the meaning specified in the Credit Agreement. This agreement will be interpreted in accordance with the Drafting Conventions.

Borrower has or may also enter into certain derivatives transactions under Hedging Agreements with Swap Counterparties, under which Borrower has or may incur Hedging Obligations to Swap Counterparties.

To induce Lender and Swap Counterparties to extend credit and provide other financial accommodations (including derivative transactions) to Borrower, and in consideration thereof, Grantor agrees as follows:

1. **The Collateral**. Grantor assigns and grants to Collateral Agent a security interest in all of the following property now owned or hereafter acquired by Grantor (collectively, the "Collateral"): (a) all accounts, contract rights, documents, documents of title, payment intangibles, investment property, chattel paper, instruments, and deposit accounts; (b) all inventory; (c) all equipment; (d) all fixtures; (e) all farm products, including crops grown, growing or to be grown, livestock born or unborn, supplies used or produced in Grantor's farming operation, and products of crops and livestock in their unmanufactured state; (f) all general intangibles, including all Intellectual Property (defined herein); (g) all proceeds of any crop insurance, price support payment or other government program; (h) rights and interests under Hedging Agreements, including all rights to the payment of money from Secured Parties under the Hedging Agreements; and all accounts, deposit accounts, and general intangibles, including payment intangibles, described in the Hedging Agreements; (i) accessions, attachments and other additions to the Collateral; (j) substitutes or replacements for any Collateral, all proceeds, products, rents and profits of any Collateral, all rights under warranties and insurance contracts covering the Collateral, and any causes of action relating to the Collateral; and (k) books and records pertaining to any Collateral, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("Books and Records").

2. **Secured Obligations**. This agreement is to secure the payment and performance of the following (collectively, the "Secured Obligations") in any order of priority that Collateral Agent or Secured Parties may choose: (a) all Obligations (defined in the Credit Agreement), including (i) the Line of Credit Note dated as of the date of this agreement, from Borrower to Lender in the original principal amount of $1,000,000.00 (the "Note") and (ii) all Hedging Obligations; (b) all obligations of Grantor under this agreement; (c) all obligations of Borrower to Lender, Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. (trading as Rabobank International), a foreign banking organization organized as a cooperative bank under the laws of The Netherlands ("Rabobank International"), and/or Rabobank, N.A., a national banking association ("RNA"), or any other Affiliate of Lender (Lender, Rabobank International and RNA, and any other Affiliate of Lender are herein individually and collectively, "Secured Parties"), whether now existing or hereafter incurred or created, whether voluntary or involuntary, whether obligatory or non-obligatory; whether due or not due, whether absolute or contingent, or whether incurred directly or acquired by assignment or otherwise, under the terms and conditions of any other written instrument or agreement executed by Grantor; and (d) any of the foregoing that arises after the filing of a petition by or against Grantor under an Insolvency Proceeding.

3. **Grantor Representations**. Grantor represents to Collateral Agent and Secured Parties that: (a) the legal name of Grantor is as appears in the first paragraph of this agreement; (b) Grantor has not used any trade name, assumed name or other name except Grantor's name stated in the first paragraph of this agreement; (c) except for liens expressly permitted under the terms of the Credit Agreement, Grantor has not granted any security interest in any of the Collateral except to Collateral Agent or Secured Parties; and (d) there are no claims, actions, proceedings or investigations pending or threatened against Grantor or affecting the Collateral with respect to any violations of Applicable Laws.

4. **Information Accurate and Complete**. Grantor's submission of any report, record or other information pertaining to the condition or operations, financial or otherwise, of Grantor, from time to time, whether or not required under Borrower's application for the Loan, Lender's underwriting and approval of the Loan, or this agreement and the other Loan Documents, will be deemed accompanied by a representation by Grantor that the report, record or information is complete and accurate in all material respects as to the condition or operations of Grantor (and, if applicable, Grantor's Subsidiaries, Affiliates, partners, shareholders, members, or other principals), including, without limitation, all material contingent liabilities.

5. **Grantor Covenants**. Until such time as all of the Secured Obligations have been paid in full, Lender has no obligation to make additional Loans and the Hedging Agreements have been terminated:

(a)        Grantor shall properly preserve, maintain and care for the Collateral; defend the Collateral against any adverse claims and demands; protect, diligently collect all accounts; and keep complete, current, and accurate Books and Records with respect to the Collateral and any proceeds or collections;

(b)        Grantor shall notify Collateral Agent in writing prior to any change in (i) Grantor's name, identity or business structure or (ii) the location(s) of (A) Grantor's place of business or Grantor's chief executive office if Grantor has more than one place of business, (B) Grantor's state of organization, or (C) Grantor's books and records concerning any Collateral;

(c)        Grantor shall promptly notify Collateral Agent in writing of any event which affects the value of the Collateral, the ability of Grantor or Collateral Agent to dispose of the Collateral, or the rights and remedies of Collateral Agent in relation thereto, including, but not limited to, the levy of any legal process against any Collateral and the adoption of any marketing order, arrangement or procedure affecting the Collateral, whether governmental or otherwise;

(d)        except for purchase money security interests related to normal trade credit and liens expressly permitted under the terms of this agreement or the Credit Agreement, Grantor will not grant any security interest in any of the Collateral except to Collateral Agent, and will keep the



EXHIBIT

C

Collateral free of all liens, claims, security interests and encumbrances of any kind or nature except the security interest of Collateral Agent and such permitted liens;

(e)     Grantor shall pay all costs necessary to preserve, defend, enforce and collect the Collateral, including but not limited to taxes, assessments, insurance premiums, repairs, rent, storage costs and expenses of sales, and any costs to perfect Collateral Agent's security interest. Without waiving Grantor's default for failure to make any such payment, Collateral Agent at its option may pay any such costs and expenses, discharge encumbrances on the Collateral, and pay for insurance of the Collateral, and such payments shall be a part of the Secured Obligations and bear interest at the rate set out in the Secured Obligations. Grantor agrees to reimburse Collateral Agent on demand for any costs so incurred;

(f)     until Collateral Agent exercises its rights to make collection, Grantor will diligently collect all Collateral;

(g)     if any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading, Grantor shall immediately deliver such document to Collateral Agent, together with any necessary endorsements;

(h)     Grantor will not sell, lease, agree to sell or lease, or otherwise dispose of any Collateral, except that until an Event of Default or the revocation by Collateral Agent of Grantor's right to do so, and subject to the provision of this agreement, Grantor may (i) sell or lease any Collateral constituting inventory or farm products in the ordinary course of business at prices constituting the fair market value thereof; and (ii) use feed, seed, fertilizer, chemicals, medicines and other supplies used or produced in Debtor's farming operations in the ordinary course of Grantor's farming operations;

(i)     Grantor will execute and deliver such additional documents as may be reasonably requested by Collateral Agent in connection with Collateral Agent's security interest in the Collateral, including all assignments, transfers and other documents required by Collateral Agent to transfer to Collateral Agent, all federal and state government program payments, rights to payment, accounts, general intangibles and benefits; and

(j)     Grantor will not attach any Collateral to any real property or fixture in a manner which might cause such Collateral to become a part thereof unless Grantor first obtains the written consent of any owner, holder of any lien on the real property or fixture, or other person having an interest in such property to the removal by Collateral Agent of the Collateral from such real property or fixture. Such written consent shall be in form and substance acceptable to Collateral Agent and shall provide that Collateral Agent has no liability to such owner, holder of any lien, or any other person

6.     **Additional Optional Requirements.** Collateral Agent may at its option at any time, whether or not Grantor is in default: (a) require Grantor to deliver to Collateral Agent (i) copies of or extracts from the Books and Records, (ii) records and schedules which show the status and condition of the Collateral and where it is located, and (iii) information on any contracts or other matters affecting the Collateral; (b) permit Collateral Agent to inspect the Collateral; (c) require Grantor to furnish to Collateral Agent a list of the buyers, processors, commission merchants, cooperatives, or selling agents to or through whom Grantor sells any farm product or other Collateral; and in the event that Grantor thereafter sells farm products or other Collateral to or through a person or entity not identified in the list, Grantor shall notify Collateral Agent of the sale not less than seven (7) days prior to the sale; (d) require Grantor to deliver to Collateral Agent any instruments or chattel paper; (e) notify or require Grantor to notify any account debtors, any buyers of the Collateral, or any other persons of Collateral Agent's interest in the Collateral; (f) notify or require Grantor to notify any account debtor to forward all payments and proceeds of the Collateral to Collateral Agent; and (g) endorse or sign Grantor's name on all checks, drafts, collections, receipts and other documents, and to take possession of and open the mail addressed to Grantor and remove therefrom any payments and proceeds of the Collateral.

7.     **Events of Default.** The following each shall be an event of default under this agreement (an "Event of Default"): (a) an Event of Default under the Credit Agreement, including a default termination event or other similar event under any Hedging Agreement which is not cured within any grace or cure period specified therein, if any; and (b) Grantor breaches any term, provision, warranty or representation under this agreement.

8.     **Remedies.** Upon the occurrence of an Event of Default, Collateral Agent may: (a) pursue any or all remedies as set forth in this agreement, the Credit Agreement or the Hedging Agreements; (b) enforce the security interest given hereunder or any other instrument or agreement pursuant to the UCC and any other Applicable Law; (c) enforce the security interest of Collateral Agent in any deposit account of Grantor maintained with any Secured Party by applying such account to the Secured Obligations; (d) require Grantor to obtain Collateral Agent's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral; (e) require Grantor to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to Collateral Agent in kind; (f) require Grantor to assemble the Collateral, including the Books and Records, and make them available to Collateral Agent at a place designated by Collateral Agent; (g) enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any of Grantor's equipment, if Collateral Agent deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral; (h) demand and collect any payments on and proceeds of the Collateral; (i) grant extensions and compromise or settle claims with respect to the Collateral for less than face value, upon reasonable prior notice to Grantor as may be required under the UCC; (j) use or transfer any of Grantor's rights and interests in any Intellectual Property now owned or hereafter acquired by Grantor, if Collateral Agent deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral. Grantor agrees that any such use or transfer shall be without any additional consideration to Grantor (as used in this agreement, "Intellectual Property" means all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which Grantor has any right or interest, whether by ownership, license, contract or otherwise); (k) have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral. Grantor hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment; (l) take such measures as Collateral Agent may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and Grantor hereby irrevocably constitutes and appoints Collateral Agent as Grantor's attorney-in-fact to perform all acts and execute all documents in connection therewith; and (m) without notice or demand to Grantor, set off and apply against any and all of the Secured Obligations any and all deposits (general or special, time or demand, provisional or final) and any other Secured Obligations, at any time held or owing by Collateral Agent or any of Collateral Agent's agents or affiliates to or for the credit of the account of Grantor or any guarantor or endorser of the Secured Obligations.

9.     **Notices.** All notices, approvals, consents, and other communications, under this agreement ("Notices") must be given in accordance with and will be subject to the terms and provisions of the Credit Agreement. Notices must be mailed or delivered, if to Grantor, to the address adjacent Grantor's signature below; if to Collateral Agent or Lender, to 12443 Olive Blvd, Suite 50, St. Louis, MO 63141, Attention: Customer Service Representative; if to Secured Parties other than Lender, c/o Rabobank International, 245 Park Avenue, New York, NY 10167, Attention:

Turner Grain Merchandising
Security Agreement

Customer Service Representative ; and in the case of any other Person, to the address designated by that Person in a notice to Grantor Collateral Agent and Secured Parties.

**10.** **Other Acts.**  Grantor shall cooperate with Collateral Agent and Secured Parties for the purposes of, and perform all acts which may be necessary or advisable to perfect any Lien provided for in this agreement or to carry out the intent of this agreement.  Promptly (but in no event more than ten days) after request by Collateral Agent and Secured Parties, Grantor will execute, acknowledge and deliver any document which Collateral Agent and Secured Parties deems necessary or advisable for these purposes, and will, on demand, pay any expenses incurred by Collateral Agent and Secured Parties in the preparation, execution and filing of any such documents.

**11.** **POWER OF ATTORNEY.**  TO FACILITATE THE PERFORMANCE OF THE AGREEMENTS OF GRANTOR UNDER THE LOAN DOCUMENTS, SECURED PARTY, IN THE NAME AND ON BEHALF OF GRANTOR OR, AT ITS OPTION, IN ITS OWN NAME, MAY (BEFORE OR AFTER AN EVENT OF DEFAULT) PERFORM OR OBSERVE ANY OBLIGATION OF GRANTOR TO SECURED PARTY AND TAKE ANY ACTION WHICH SECURED PARTY MAY DEEM NECESSARY OR DESIRABLE TO CURE OR CORRECT SUCH FAILURE.  GRANTOR IRREVOCABLY AUTHORIZES SECURED PARTY AND GRANTS SECURED PARTY A POWER OF ATTORNEY IN THE NAME AND ON BEHALF OF THE GRANTOR OR, AT ITS OPTION, IN ITS OWN NAME, COUPLED WITH AN INTEREST, TO COLLECT, RECEIVE, RECEIPT FOR, CREATE, PREPARE, COMPLETE, EXECUTE, ENDORSE, DELIVER, AND FILE ANY AND ALL INSURANCE APPLICATIONS, REMITTANCES, INSTRUMENTS, DOCUMENTS, CHATTEL PAPER, AND OTHER WRITINGS, TO GRANT AN EXTENSION TO, COMPROMISE, SETTLE, WAIVE, NOTIFY, AMEND, ADJUST, CHANGE, AND RELEASE ANY OBLIGATION OF ANY ACCOUNT GRANTOR, OBLIGOR, INSURER, OR OTHER PERSON PERTAINING TO ANY COLLATERAL, AND TAKE ANY OTHER ACTION DEEMED BY SECURED PARTY TO BE NECESSARY OR DESIRABLE TO ESTABLISH, PERFECT, PROTECT, OR ENFORCE THE SECURED PARTY'S INTEREST IN THE COLLATERAL.  Grantor shall execute FSA/CCC Power of Attorney forms and any other documents required to enable Secured Party to execute any and all documents necessary for application for, compliance or reporting of necessary information for all FSA/CCC programs.  Secured Party has no duty to exercise any of the authority granted in this paragraph.  Secured Party shall not be liable for any act or failure to act in connection with the collection of or the preservation of any rights with respect to the Collateral described in this paragraph.

**12.** **Miscellaneous.**

(a)      This agreement is subject to the terms of a collateral agency agreement between the Secured Parties (the "Collateral Agency Agreement").

(b)      The Credit Agreement, the other Transaction Documents, and each other agreement or instrument made or entered into in connection with each of the Secured Obligations (collectively, the "Secured Obligation Documents"), collectively: (i) represent the sum of the understandings and agreements between Collateral Agent, Secured Parties and Grantor concerning this credit; (ii) replace any prior oral or written agreements between Collateral Agent, Secured Parties and Grantor concerning this credit; and (iii) are intended by Collateral Agent, Secured Parties and Grantor as the final, complete and exclusive statement of the terms agreed to by them.  The Secured Obligation Documents also grant further rights to Collateral Agent and Secured Parties and contain further agreements and affirmative and negative covenants by Grantor which apply to this agreement and to the Collateral.

(c)      Each waiver by Collateral Agent or Secured Parties must be in writing, and no waiver is to be construed as a continuing waiver.  No waiver is to be implied from any delay or failure by Collateral Agent or Secured Parties to take action on account of any default of Grantor.  Consent by Collateral Agent or Secured Parties to any act or omission by Grantor must not be construed as a consent to any other or subsequent act or omission or to waive the requirement for Collateral Agent's Secured Parties' consent to be obtained in any future or other instance.  The exercise by Collateral Agent or Secured Parties of any right or remedy under this agreement or the other Secured Obligation Documents or under Applicable Law, shall not: cure or waive a breach, Event of Default or notice of default when any notice of default under this agreement or invalidate any act performed pursuant to any such default or notice; or nullify the effect of any notice of default or sale (unless all Secured Obligations then due have been paid and performed and all other defaults under the Secured Obligation Documents, including any Hedging Agreements, have been cured); or impair the security of this agreement; or prejudice Collateral Agent or Secured Parties, or any receiver appointed in accordance with this agreement, in the exercise of any right or remedy afforded any of them under this agreement; or be construed as an affirmation by Collateral Agent or Secured Parties of any tenancy, lease or option, or a subordination of the lien of this agreement.

(d)      Grantor waives all rights, legal and equitable, it may now or hereafter have to require marshaling of assets or to require upon foreclosure sales of assets in a particular order.  Each successor and assign of Grantor, including any holder of a lien subordinate to this agreement, by acceptance of its interest or lien agrees that it shall be bound by the above waiver, as if it had given the waiver itself.

(e)      If Grantor consists of more than one Person, each Grantor (a) acknowledges that this agreement is the independent and several obligation of each Grantor and may be enforced against each Grantor separately, whether or not enforcement of any right or remedy hereunder has been sought against any other Grantor; and (b) agrees that its liability hereunder and under any other Secured Obligation Document shall be absolute, unconditional, continuing and irrevocable.  GRANTOR EXPRESSLY WAIVES ANY REQUIREMENT THAT COLLATERAL AGENT OR SECURED PARTIES EXHAUST ANY RIGHT, POWER OR REMEDY AND PROCEED AGAINST THE OTHER GRANTORS UNDER THIS AGREEMENT, OR ANY OTHER SECURED OBLIGATION DOCUMENTS, OR AGAINST ANY OTHER PERSON UNDER ANY GUARANTY OF, OR SECURITY FOR, ANY OF THE SECURED OBLIGATIONS.

(f)      If Grantor is comprised of multiple Persons, any Person comprising Grantor is hereby authorized to bind all parties comprising Grantor.  Collateral Agent and Secured Parties may, at any time and without notice, waive any prior requirement that requests, authorizations, or other actions be taken only by a Designated Person.

(g)      This agreement shall inure to the benefit of and shall be binding upon the parties and their respective successors and assigns; provided that Grantor shall not assign its rights or obligations hereunder without Secured Parties' consent.  However, this Paragraph does not waive the provisions of Section 5(h); and Grantor shall not assign its rights or obligations hereunder without the consent of Collateral Agent and Secured Parties.  Collateral Agent and Secured Parties may transfer all or any portion of its rights under the Secured Obligation Documents to any other Person.  Collateral Agent and Secured Parties may disclose to any actual or proposed transferee any information that Grantor has delivered to Collateral Agent or Secured Parties in connection with the negotiation of this agreement or pursuant to the Secured Obligation Documents; and Grantor shall cooperate fully with Collateral Agent and Secured Parties in providing that information to any actual or proposed transferee.

(h)      All rights and remedies under this agreement and the Secured Obligation Documents are cumulative, and the exercise of any one or more of them does not constitute an election of remedies.

Turner Grain Merchandising
Security Agreement

3

(i)      Any provision of any Secured Obligation Document which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of that Secured Obligation Document or affecting the validity or enforceability of that provision in any other jurisdiction; except that if such provision relates to the payment of any monetary sum, then Collateral Agent may, at its option, declare all Secured Obligations immediately due and payable.

(j)      This agreement may not be amended, changed, modified, altered or terminated without the prior written consent of Collateral Agent and Secured Parties.

(k)      This agreement shall be governed exclusively by the applicable laws of the State of Iowa (the "Governing Law State") without regard or reference to its conflict of laws principles.  Grantor understands that the laws of the Governing Law State may differ from the laws of the State where Grantor resides or otherwise is located or where the Collateral is located.  However, Grantor understands, agrees and acknowledges that (a) this agreement and the Secured Obligation Documents have significant and substantial contacts with the Governing Law State, (b) it is convenient to Grantor and Lender to select the law of the Governing Law State to govern this agreement and the transactions evidenced hereby, (c) the transactions evidenced by this agreement bear a reasonable connection to the laws of the Governing Law State, (d) the choice of the internal laws of the Governing Law State was made for good and valid reasons, and (e) the choice of the Governing Law State constitutes good and valuable consideration for Secured Parties to enter into the Secured Obligation Documents and Secured Parties have entered into the Secured Obligation Documents in reliance on this choice.

(l)      GRANTOR IRREVOCABLY AGREES THAT, AT THE OPTION OF COLLATERAL AGENT, ALL ACTIONS, PROCEEDINGS OR COUNTERCLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT WILL BE LITIGATED IN THE IOWA DISTRICT COURT FOR BLACK HAWK COUNTY, IOWA, OR THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF IOWA.  GRANTOR IRREVOCABLY CONSENTS TO SERVICE, JURISDICTION, AND VENUE OF THOSE COURTS FOR ALL SUCH ACTIONS, PROCEEDINGS AND COUNTERCLAIMS AND WAIVES ANY OTHER VENUE TO WHICH IT MIGHT BE ENTITLED BY VIRTUE OF DOMICILE, HABITUAL RESIDENCE OR OTHERWISE.

(m)      This agreement may be executed in counterparts, each of which will be an original and all of which together are deemed one and the same instrument.

(n)      Collateral Agent is authorized to execute any other documents or take any other actions necessary to effectuate this agreement and the consummation of the transactions contemplated herein.

(o)      Collateral Agent and Secured Parties are authorized to order a credit report and verify all other credit information, including past and present loans and standard references from time to time to evaluate the creditworthiness of Grantor.  Without limitation, a copy of the consent for release of information, general authorization or similar document on file with Collateral Agent or Secured Parties shall authorize third Persons to provide the information requested from time to time.

(p)      Each Party has participated in negotiating and drafting this agreement, so if an ambiguity or a question of intent or interpretation arises, this agreement is to be construed as if the parties had drafted it jointly, as opposed to being construed against a Party because it was responsible for drafting one or more provisions of this agreement.

(q)      THE PARTIES (A) COVENANT AND AGREE NOT TO ELECT A TRIAL BY JURY IN ANY ACTION OR PROCEEDING FOR THE RESOLUTION OF ANY CONTROVERSY OR CLAIM THAT ARISES OUT OF OR RELATES TO: (I) THIS AGREEMENT; OR (II) ANY SECURED OBLIGATION DOCUMENT, WHETHER ARISING IN CONTRACT, TORT OR BY STATUTE (INDIVIDUALLY AND COLLECTIVELY, A "CONTROVERSY OR CLAIM"); AND, (B) TO THE EXTENT PERMITTED BY APPLICABLE LAW, WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY CONTROVERSY OR CLAIM TO THE EXTENT SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THE PROVISIONS OF THIS SECTION ARE GIVEN KNOWINGLY AND VOLUNTARILY, AND ARE A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THE SECURED OBLIGATION DOCUMENTS AND THE SWAP COUNTERPARTIES ENTERING INTO THE HEDGING AGREEMENTS.

13.      IMPORTANT: READ BEFORE SIGNING.  THE TERMS OF THIS AGREEMENT SHOULD BE READ CAREFULLY BECAUSE ONLY THOSE TERMS IN WRITING ARE ENFORCEABLE.  NO OTHER TERMS OR ORAL PROMISES NOT CONTAINED IN THIS WRITTEN CONTRACT MAY BE LEGALLY ENFORCED. YOU MAY CHANGE THE TERMS OF THIS AGREEMENT ONLY BY ANOTHER WRITTEN AGREEMENT.

Turner Grain Merchandising
Security Agreement

Grantor is signing this agreement effective as of the day and year first written above.

**GRANTOR**

Address for notices:

411 North Main
Brinkley, Arkansas 72021
Attention:  Jason Coleman & Dale Bartlett

Alternate address for notice by U.S. Mail:

P.O. Box 756
Marvell, Arkansas 72366
Attention:  Jason Coleman & Dale Bartlett

411 North Main
Brinkley, Arkansas 72021
Attention:  Jason Coleman & Dale Bartlett

Alternate address for notice by U.S. Mail:

P.O. Box 756
Marvell, Arkansas 72366
Attention:  Jason Coleman & Dale Bartlett

**TURNER GRAIN MERCHANDISING, INC.**, an Arkansas corporation

By: _____
    DALE C. BARTLETT
    President

By: _____
    JASON T. COLEMAN
    Secretary

Turner Grain Merchandising
Security Agreement

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**CT Lien Solutions**
Representation of filing

**This filing is Completed**
File Number : 40000081410745
File Date : 06-Jan-2014

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
| Phone: Fax: |
| B. E-MAIL CONTACT AT FILER (optional) |
| C. SEND ACKNOWLEDGMENT TO: (Name and Address)   8477 - RABO |

⌐ Rabo AgriFinance          41253511
  P.O. Box 411995
  St. Louis, MO 63141        ARAR
⌐

File with: Secretary of State, AR

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME |  |  |  |  |
|---|---|---|---|---|
| TURNER GRAIN MERCHANDISING, INC. |  |  |  |  |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 411 NORTH MAIN | BRINKLEY | AR | 72021 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME |  |  |  |  |
|---|---|---|---|---|
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME |  |  |  |  |
|---|---|---|---|---|
| RABO AGRIFINANCE, INC. |  |  |  |  |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 12443 Olive Blvd, Suite 50 | St. Louis | MO | 63141 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
(a) all accounts, contract rights, documents, documents of title, payment intangibles, investment property, chattel paper, instruments, and deposit accounts;
(b) all inventory;
(c) all equipment;
(d) all fixtures;
(e) all farm products, including crops grown, growing or to be grown, livestock born or unborn, supplies used or produced in Debtor's farming operation, and products of crops and livestock in their unmanufactured state;
(f) all general intangibles, including all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which Debtor has any right or interest, whether by ownership, license, contract or otherwise ("Intellectual Property");
(g) all proceeds of any crop insurance, price support payment or other government program;
(h) rights and interests under any interest rate swap, interest rate caps, interest rate collars or other similar agreement between Debtor and a Secured Party, Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. (trading as "Rabobank International"), a foreign banking organization organized as a cooperative bank under the laws of The Netherlands, or any of their affiliates (collectively, "Swap Counterparties"), for the purpose of fixing or limiting interest expense, or any foreign exchange, currency hedging, commodity hedging, security hedging or other agreement between Debtor and Secured Parties or any of their affiliates, for the purpose of limiting the market risk of holding currency, a security or a commodity in either the cash or futures markets, including all rights to the payment of money from Secured Parties under the Hedging Agreements; and all accounts, deposit accounts, and

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

| 6a. Check only if applicable and check only one box: | | | 6b. Check only if applicable and check only one box: | |
|---|---|---|---|---|
| ☐ Public-Finance Transaction | ☐ Manufactured-Home Transaction | ☐ A Debtor is a Transmitting Utility | ☐ Agricultural Lien | ☐ Non-UCC Filing |

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
41253511          10908500          TURNER GRAIN MERCH...

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by CT Lien Solutions
Glendale, CA 91209-9071

**EXHIBIT D**

# UCC FINANCING STATEMENT ADDENDUM
FOLLOW INSTRUCTIONS

9. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank
   because Individual Debtor name did not fit, check here ☐

| 9a. ORGANIZATION'S NAME |
| --- |
| TURNER GRAIN MERCHANDISING, INC. |

OR

| 9b. INDIVIDUAL'S SURNAME |
| --- |
| FIRST PERSONAL NAME |
| ADDITIONAL NAME(S)/INITIAL(S) |   | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

10. DEBTOR'S NAME: Provide (10a or 10b) only **one** additional Debtor name or Debtor name that did not fit in line 1b or 2b of the Financing Statement (Form UCC1) (use exact, full name;
do not omit, modify, or abbreviate any part of the Debtor's name) and enter the mailing address in line 10c

| 10a. ORGANIZATION'S NAME |
| --- |

OR

| 10b. INDIVIDUAL'S SURNAME |
| --- |
| INDIVIDUAL'S FIRST PERSONAL NAME |
| INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) |

| 10c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |

11. ☐ ADDITIONAL SECURED PARTY'S NAME   **or**   ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only **one** name (11a or 11b)

| 11a. ORGANIZATION'S NAME |
| --- |

OR

| 11b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| --- | --- | --- | --- |

| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| --- | --- | --- | --- | --- |

12. ADDITIONAL SPACE FOR ITEM 4 (Collateral):
general intangibles, including payment intangibles, described in any of the Hedging Agreements;
(i) accessions, attachments and other additions to the Collateral;
(j) substitutes or replacements for any Collateral, all proceeds, products, rents and profits of any Collateral, all rights under warranties and insurance contracts covering the Collateral, and any causes of action relating to the Collateral; and
(k) books and records pertaining to any Collateral, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("Books and Records").

| 13. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS (if applicable) | 14. This FINANCING STATEMENT: ☐ covers timber to be cut   ☐ covers as-extracted collateral   ☐ is filed as a fixture filing |
| --- | --- |
| 15. Name and address of a RECORD OWNER of real estate described in item 16 (if Debtor does not have a record interest): | 16. Description of real estate: |

17. MISCELLANEOUS: 41253511-AR-0   8477 - RABO AGRIFINANCE          RABO AGRIFINANCE, INC.          File with: Secretary of State, AR          10908500   TURNER GRAIN

FILING OFFICE COPY — UCC FINANCING STATEMENT ADDENDUM (Form UCC1Ad) (Rev. 04/20/11)

Prepared by CT Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

Report: MLS008R1         Loan History Statement         Date: 08/29/2014

| | | |
|---|---|---|
| Loan Number: | 10908500 | Borrower Information: |
| Interest Rate: | 3.65580% | First and Last Name:    Turner Grain Merchandising, Inc. |
| Original Principal Balance: | $1,000,000.00 | Address 1:    411 North Main |
| Original Loan Date: | 01/06/2014 | Address 2: |
| Maturity Date: | 01/01/2015 | City, State, ZIP:    Brinkley, AR 72021 |
| Payment Due: | Annual | Phone:    (870) 830-5526 |
| Current Principal Balance: | $985,140.00 | |

Payment history detail for the period: 01/06/2014 through 08/18/2014

| Due Date | Transaction Description | Date Paid | Int. Rate | Principal Balance | Principal Transaction | Interest Transaction | Late Charge Transaction | Other Transaction | Total Transaction |
|---|---|---|---|---|---|---|---|---|---|
| | Opening balance | 01/06/2014 | 3.66770% | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Draw | 01/06/2014 | 3.66770% | 500,000.00 | 500,000.00 | 0.00 | 0.00 | 0.00 | 500,000.00 |
| | Rate Change | 01/06/2014 | 3.66770% | 500,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Draw | 01/07/2014 | 3.66770% | 900,000.00 | 400,000.00 | 0.00 | 0.00 | 0.00 | 400,000.00 |
| | Draw – Withheld Fee | 01/07/2014 | 3.66770% | 900,028.00 | 28.00 | 0.00 | 0.00 | 0.00 | 28.00 |
| | Service Fee – Paid | 01/07/2014 | 3.66770% | 900,028.00 | 0.00 | 0.00 | 0.00 | -28.00 | -28.00 |
| | Rate Change | 02/01/2014 | 3.65850% | 900,028.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Payment | 02/28/2014 | 3.65850% | 28.00 | -900,000.00 | 0.00 | 0.00 | 0.00 | -900,000.00 |
| | Rate Change | 03/01/2014 | 3.65450% | 28.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Draw | 03/17/2014 | 3.65450% | 800,028.00 | 800,000.00 | 0.00 | 0.00 | 0.00 | 800,000.00 |
| | Draw – Withheld Fee | 03/17/2014 | 3.65450% | 800,056.00 | 28.00 | 0.00 | 0.00 | 0.00 | 28.00 |
| | Service Fee – Paid | 03/17/2014 | 3.65450% | 800,056.00 | 0.00 | 0.00 | 0.00 | -28.00 | -28.00 |
| | Draw | 03/24/2014 | 3.65450% | 980,056.00 | 180,000.00 | 0.00 | 0.00 | 0.00 | 180,000.00 |
| | Draw – Withheld Fee | 03/24/2014 | 3.65450% | 980,084.00 | 28.00 | 0.00 | 0.00 | 0.00 | 28.00 |
| | Service Fee – Paid | 03/24/2014 | 3.65450% | 980,084.00 | 0.00 | 0.00 | 0.00 | -28.00 | -28.00 |
| | Rate Change | 04/01/2014 | 3.65175% | 980,084.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Rate Change | 05/01/2014 | 3.65150% | 980,084.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Rate Change | 06/01/2014 | 3.65100% | 980,084.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Rate Change | 07/01/2014 | 3.65150% | 980,084.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| | Payment | 07/16/2014 | 3.65150% | 580,084.00 | -400,000.00 | 0.00 | 0.00 | 0.00 | -400,000.00 |
| | Draw | 07/23/2014 | 3.65150% | 610,084.00 | 30,000.00 | 0.00 | 0.00 | 0.00 | 30,000.00 |
| | Draw – Withheld Fee | 07/23/2014 | 3.65150% | 610,112.00 | 28.00 | 0.00 | 0.00 | 0.00 | 28.00 |
| | Service Fee – Paid | 07/23/2014 | 3.65150% | 610,112.00 | 0.00 | 0.00 | 0.00 | -28.00 | -28.00 |
| | Draw | 07/23/2014 | 3.65150% | 985,112.00 | 375,000.00 | 0.00 | 0.00 | 0.00 | 375,000.00 |
| | Draw – Withheld Fee | 07/23/2014 | 3.65150% | 985,140.00 | 28.00 | 0.00 | 0.00 | 0.00 | 28.00 |
| | Service Fee – Paid | 07/23/2014 | 3.65150% | 985,140.00 | 0.00 | 0.00 | 0.00 | -28.00 | -28.00 |
| | Rate Change | 08/01/2014 | 3.65580% | 985,140.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| **Total:** | | | | | 985,140.00 | 0.00 | 0.00 | -140.00 | 985,000.00 |

EXHIBIT

E

PENGAD 800-631-6989

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
EASTERN DIVISION

RABO AGRIFINANCE, INC.                                       PLAINTIFF

vs.                          Case No. _____

TURNER GRAIN MERCHANDISING, INC.;
JASON T. COLEMAN; and
DALE C. BARTLETT.                                            DEFENDANTS

### AFFIDAVIT OF ACCOUNT

I, Mark Fischels, state under oath as follows:

1.     I am a Senior Vice President of Rabo Agrifinance, Inc.  I make this affidavit based on my personal knowledge and from information provided to me in my capacity as Senior Vice President of Rabo Agrifinance, Inc.  I am more than 18 years of age.

2.     Exhibit A to the Complaint in the above-captioned action is a true and correct copy of the Credit Agreement between Rabo Agrifinance, Inc. and Turner Grain Merchandising, Inc., Jason T. Coleman, and Dale C. Bartlett.

3.     Exhibit B to the Complaint in the above-captioned action is a true and correct copy of the Line of Credit Note extended to Turner Grain Merchandising, Inc., Jason T. Coleman, and Dale C. Bartlett by Rabo Agrifinance, Inc.

4.     Exhibit C to the Complaint in the above-captioned action is a true and correct copy of the Security Agreement between Rabo Agrifinance, Inc. and Turner Grain Merchandising, Inc., granting Rabo Agrifinance, Inc. a security interest in all accounts, inventory, equipment, fixtures, farm products, general intangibles, proceeds of crop insurance, price support payment, or other governmental program, rights and interests under Hedging Agreements, accessions, attaches and other additions to the collaterals; substitutes or replacement for collateral, all



EXHIBIT
F

proceeds, products, rents, and profits of any collateral including rights under warranties and insurance contracts, and causes of action relating to collateral, all books and records pertaining to any collateral and all other collateral specified in the Security Agreement.

5.    Exhibit D to the Complaint in the above-captioned action is a true and correct copy of the UCC Financing Statement filed by Rabo Agrifinance, Inc. with the Arkansas Secretary of State, perfecting its security interest.

6.    Exhibit D to the Complaint in the above-captioned action is a true and correct copy of the transactions on Turner Grain Merchandising, Inc.'s line of credit with Rabo Agrifinance, Inc. (Loan #1 0908500). Currently, the outstanding principal amount is $985,140.00.

7.    No payments have been made on the $985,140.00.owed under Turner Grain Merchandising, Inc.'s line of credit.

8.    I hereby swear on this 9th day of September, 2014 that the above statements are true and correct to the best of my knowledge and belief.

Mark Fischels, Senior Vice President
RABO AGRIFINANCE, INC.

2

STATE OF MISSOURI          )
                           )
COUNTY OF _S̲T̲.̲ ̲L̲o̲u̲i̲s̲_   )

The above named Mark Fischels appeared personally before me on this 9th day of September, 2014, and swore that the above statements are true and correct to the best of their knowledge and belief.

_Sharon M Speak_
NOTARY PUBLIC

My Commission Expires:

_12 - 7 - 2014_

SHARON M. SPEAK
Notary Public - Notary Seal
Comm. Number 10528832
STATE OF MISSOURI
St. Charles County
My Commission Expires: Dec. 7, 2014

3